BERNARDI GREATER SHOWS, INC.

*v.*

BOSTON & MAINE RAILROAD..

JOHN S. KIMBALL, *Adm'r v.* SAME.

EDWARD BITTNER *v.* SAME.

148

150

*Cooper & Hall, Robert W. Upton, Joseph C. Donovan* and *F. Clyde Keefe* (*Mr. Hall* orally), for the plaintiffs.

*Hughes & Burns* and *Conrad E. Snow* (*Mr. Snow* orally), for the defendant.

BRANCH, J.   1. It is plain that the provisions of the contract here involved furnish no answer to some of the allegations in the declarations of the plaintiffs, and that the broad question reserved by the superior court must therefore be answered in the negative.   It is alleged that the defendant undertook to keep the cars of the show company in a fit and safe state of repair through its regular and customary system of inspection and repair and made a charge against the show company for this service, but that the inspection was negligently performed and that this negligence contributed to cause the accident.   Although the show company undertook in the fourth clause of the contract that "each car and the contents thereof shall be of character and in order suitable for such movement," the matter of inspection and repair is not covered by the contract, and may well have been the subject of collateral or subsequent agreement.   Therefore, if evidence in support of the foregoing allegation were introduced, a question for the jury would be presented in each of the cases.

There is also an allegation in the declaration of the show company that the damage to its property resulting from the collision was aggravated and increased by the negligent handling thereof after the accident by the defendant's wrecking crew.   Obviously the provisions of the contract furnish no answer to this allegation.

It appears to have been the purpose of the court, however, to secure in advance of trial a decision as to the effect of the contract upon all the claims of the various plaintiffs, and the case has been argued upon the assumption that all such matters are before this court for

decision. The questions in regard to the scope and effect of the contract, which seem to be essential to a proper disposition of the cases, have, therefore, been considered.

2. The first position taken by the defendant is that it is not liable for negligence on the part of the train crew because they were acting at the time of the accident, not as the servants of the defendant, but as the special agents of the show company. In support of this position, reliance is placed upon the provisions of the first and fifth clauses of the contract which are summarized by the defendant in its brief as follows: "As to these employees the contract provided that the Railroad should furnish 'the necessary conductors, engineers and other trainmen, and sufficient motive power' (paragraph 'first'), and be a hirer to the Show of the motive power and men to operate the same, and that the conductors, engineers, trainmen and other employees furnished by the Railroad under the contract, or acting or under duty to act in the performance of or in reference to the service provided for should, as between the parties, while engaged or under duty to act in such service and employment, be deemed to be the servants of the Show (paragraph 'fifth')."

It should be noted in passing that these stipulations obviously furnish no answer to the allegation that the defective condition of the defendant's road bed was a cause of the accident. Furthermore, other provisions of the contract entirely destroy the force of the defendant's contention. By the first clause thereof the defendant agreed not only to furnish a train crew and motive power, but also that "the Railroad" would perform the switching and placing of cars for loading and unloading at its stations and would "transport" the show, show materials, persons in charge thereof, employees and performers upon the dates and between the points specified therein. It, therefore, appears that the defendant corporation itself as "The Railroad" agreed to perform for the plaintiff its customary services of switching and placing cars and transporting property and persons over its lines. Under these circumstances the subsequent stipulations appearing in the fifth clause of the agreement that the contract "is not made with the said Railroad as a carrier, either common or special . . . but as a hirer to the Show of the cars and motive power and of men to operate the same," must be regarded as nugatory because inconsistent with the obligations plainly assumed by the first clause. The fact is that the first and fifth clauses of the contract appear to have been framed upon two distinct and conflicting theories. The first clause, read in connection with the sixth indicates that the

defendant as "The Railroad" was undertaking to perform for the plaintiff a service of transportation under special conditions and at reduced rates. In contrast to this the fifth clause embodies the theory that the defendant was letting its road bed, equipment and servants to the show company and would allow the latter to do its own transportation.

We have no hesitation in holding that the provisions of the first clause, which state the actual undertaking of the defendant, must take precedence over those of the fifth clause which purport to state the legal capacities in which the parties contracted and to assert the existence of legal relationships incompatible with those necessarily incident to the performance of the service previously promised. A railroad corporation contracting for itself to switch and place cars and to transport goods and persons upon its own road bed cannot successfully maintain that it acts otherwise than as a carrier or that the men employed and paid by it are, while engaged in the performance of these services, special agents of the shipper, for whose conduct it is not responsible. One who undertakes for hire to transport the goods of another is *ex vi termini* a carrier. "The authorities recognize two classes of carriers, viz., private carriers and common carriers. All persons who undertake for hire, to carry the goods of another, belong to one or the other of these classes." 4 R. C. L., Tit. Carriers, *s.* 8. The general servants of a carrier, while engaged in the performance of its undertaking to carry, cannot be converted by the mere declaration of the parties into servants of the shipper. This, however, is a subtlety which need not detain us, for no such result seems to be contemplated by the contract. The stipulation that the defendants' trainmen, while engaged in the performance of this agreement, shall be deemed to be the servants of the show, is obviously a corollary of the previous declaration that the defendant contracted only "as a hirer to the Show of the cars and motive power and of men to operate the same," and the invalidity of that declaration having been established, the corollary falls with it.

Since the contention of the defendant that the trainmen were, at the time of the accident, the servants of the show company, is not supported by the provisions of the contract, we need not now consider the effect of the allegation in the declaration that "the control, movement and direction of said train" were "under the sole care, control, and management" of the defendant; or the effect upon the individual plaintiffs of the limitation in the contract which provides that "as between the parties hereto" trainmen shall be deemed to

be the servants of the show; or the merits of the plaintiff's argument that the contract violates the statutory prohibition against leasing a railroad without the approval of the public service commission. P. L., c. 240, s. 27.

3. The second position taken by the defendant has reference only to the action of the show company for damage to its goods and equipment, and it is contended that the contract is a bar to this action even if the negligence of the defendant's servants was the cause of the accident. This argument necessitates the establishment of two propositions, first, that the validity of the contract in so far as it affects the liability of the defendant for property damage is to be determined by the federal law, and, second, that the federal courts recognize as valid, contracts stipulating against liability for negligence under the circumstances disclosed in this case.

Upon the first of these points the position of the defendant is well taken. In the exercise of its undoubted power to regulate interstate commerce (U. S. Const. Art. 1, s. 8) congress passed the act of June 29, 1906, commonly known as the Carmack amendment to the interstate commerce act (act of June 29, 1906, c. 3591; 34 Stat. 584, 595; U. S. C. A. Tit. 49, s. 20, par. 11) which covers in a comprehensive manner the subject of liability of carriers for interstate shipments of property. This statute has frequently been construed by the supreme court of the United States and the essential questions as to its scope and effect have been authoritatively settled. Ever since the case of Adams Express Company v. Croninger, 226 U. S. 491 was decided in 1913 it has been clear that, by this act, congress took full possession of the subject of carriers' liability for interstate shipments of property, and superseded all state regulation with reference to it.

As a result of this conclusion it has been definitely established that the validity of any limitation upon the liability of a common carrier with reference to interstate transportation of goods, involving as it does the construction of this statute, presents a federal question depending for its solution upon the acts of congress and the common law rules accepted and applied in the federal courts. Adams Express Co. v. Croninger, supra; Missouri &c. Ry Co. v. Harriman, 227 U. S. 657; Cincinnati &c. Ry Co. v. Rankin, 241 U. S. 319. The effect of the contract here involved, upon the liability of the defendant for damage to the goods, chattels and equipment of the show company must, therefore, be decided in accordance with the law as it is administered in the federal courts.

Decisions of the highest federal authority establish the rule that a

railroad, when contracting for the performance of services outside the scope of its duty as a common carrier, may lawfully stipulate that it shall not be liable for loss or damage occurring during the performance of such services even though the injury be due to its negligence or that of its servants. *Baltimore &c. Ry* v. *Voigt,* 176 U. S. 498; *Boering* v. *Railway,* 193 U. S. 442; *Santa Fe &c. Ry* v. *Company,* 228 U. S. 177; *Robinson* v. *Railroad,* 237 U. S. 84. The view which the supreme court takes of such contracts has been effectively summarized as follows: "It is apparent that there may be special engagements which are not embraced within its duty as a common carrier although their performance may incidentally involve the actual transportation of persons and things, whose carriage in other circumstances might be within its public obligation. ... The parties then were free to make their own bargain as to this transportation and the liability which should attach to it. There is no rule of public policy which denies effect to their expressed intention but on the contrary as the matter lies within the range of permissible agreement, the highest public policy is found in the enforcement of the contract which was actually made." *Hughes,* J. in *Santa Fe &c. Ry* v. *Company, supra,* 185, 188.

In the case of *Chicago &c. Ry* v. *Wallace,* 66 Fed. Rep. 506, which was decided by the circuit court of appeals in 1895, it was held, that a contract for the movement of a circus train came within the foregoing principle and that a provision in the contract releasing the railroad from all liability for claims and damages from whatever cause was valid.

In *Wilson* v. *Railroad,* 129 Fed. Rep. 774, a demurrer to the plaintiff's declaration was sustained by the district court upon the same ground.

In *Clough* v. *Railway,* 155 Fed. Rep. 81; *Sager* v. *Railway,* 166 Fed. Rep. 526; and *McCree* v. *Davis,* 280 Fed. Rep. 959, the correctness of the decision in the *Wallace* case was assumed, although in each of these cases the decision turned upon other considerations. We have been referred to no case in which the supreme court of the United States has passed definitely upon the point adjudicated in the *Wallace* case. It may, therefore, be said that the precise point at issue in the present case has not been authoritatively settled.

The reasons which led the court in the first of these cases to the conclusion that in hauling circus trains railroads undertake a service outside the scope of their duties as common carriers were thus stated by *Bunn,* D. J. "We know from common observation that they do not hold themselves out as common carriers of wild and domestic ani-

mals to be transported in the private cars of the owners, and loaded in a manner agreeable to the owners; persons, animals, horses, and other property being carried upon the same train, which is operated at irregular times and seasons, at the convenience of the owners of such cars. They ordinarily operate their freight trains and passenger trains separately, and upon time schedules, prepared in advance by experts for the company, and with a view to reduce the danger of accident to a minimum." (*p.* 510.) In other cases where the same conclusion has been reached, similar considerations have formed the basis of decision and there have been few additions to the catalogue of items enumerated by *Bunn*, J. See *Dierickx* v. *Davis*, 80 Ind. App. 71; *Coup* v. *Railroad*, 56 Mich. 111.

Except for the implication that railroads do not hold themselves out as common carriers of wild animals, a factor which does not enter into the present case, we doubt whether these assertions can today be validated by an appeal to common observation. We think that general acceptance would more readily be accorded to the following statements than to those above quoted: We know from common observation that railroads hold themselves out as common carriers of many kinds of animals and that such animals are frequently, if not usually, loaded for shipment by their owners; that railroads haul in the usual course of business and in increasing numbers, private cars of many different kinds such as coal cars, refrigerator cars and tank cars; that in many parts of the country the practice of running mixed trains made up of passenger and freight cars is common and that upon such trains persons, animals, and other property may be transported simultaneously; that railroads are usually glad to operate special trains at the convenience of patrons who are able and willing to pay for such service and that the safe management of such trains involves no serious difficulties or dangers of operation.

If the factual basis of the court's reasoning be accepted as sound, however, doubt still remains as to the sufficiency of the enumerated factors to compel the conclusion as a matter of law that the railroad which undertook this kind of a service did not act as a common carrier. We think that the court in the *Wallace* case confused the nature of the service rendered with the terms upon which it was undertaken.

There has been no dissent from the statement of *Bradley*, J., in *New York &c. Railroad Company* v. *Lockwood*, 17 Wall. 357, 377, that "a common carrier may, undoubtedly, become a private carrier, or a bailee for hire, when, as a matter of accommodation or special en-

gagement, he undertakes to carry something which it is not his business to carry." There is little room for doubt that under the law of this state it is the "business" of common carriers to transport "such passengers and such freight as there is no good reason for their refusing to carry." *McDuffee* v. *Railroad*, 52 N. H. 430, 454. Drunken men and explosives may be cited as examples of passengers and freight which there is a good reason for their refusing to carry.

If the extent to which common carriers "hold themselves out," or profess their willingness to serve the public determines what subjects of transportation they are bound to accept (see *Milford Quarry Co.* v. *Railroad*, 84 N. H. 407) which was the test adopted by *Bunn, J.* in the passage above quoted, then the terms of such profession must be ascertained as questions of fact from the evidence presented in each case (1 Wyman, Public Service Corporations, *s.* 250), and, as will later appear, an important item of evidence seems to have been overlooked or ignored by the court in the *Wallace* case.

Whatever test may be applied in determining whether property offered for shipment is of a kind which the carrier must accept, the law here is well settled, upon principles which we believe to be sound, that a common carrier does not lose its character as such and become a mere bailee for hire because a contract for the transportation of chattels which it is clearly bound to carry provides that they shall be carried in a particular way or under certain conditions. *Wessman* v. *Railroad*, 84 N. H. 475, 488; *Baker* v. *Railroad*, 74 N. H. 100; *McDuffee* v. *Railroad*, 52 N. H. 430. The true view of such a situation is, we think, expressed by the Kentucky court of appeals in one of the express messenger cases as follows: "The mere fact that it [the railroad] makes some special arrangement with some person or company for the transportation of persons, or property, over its line, in a particular way or under certain conditions, does not deprive it of its character as a common carrier, or convert it into a bailee for hire." *Davis* v. *Railway*, 122 Ky. 528, 540.

If it be assumed that the wild animals in the *Wallace* circus came within the classification of unacceptable freight and that as to them the contract was, therefore, valid, no reason was suggested by the court which would have justified the railroad in refusing to accept any of the other material offered for transportation in that case, and all the other factors mentioned by the court have to do with the terms upon which or the manner in which the transportation was to be accomplished. We, therefore, have difficulty in accepting the conclusion of the court in that case that the defendant in making the con-

tract and transporting this part of the property of the circus, did not act as a common carrier.

In the present case, however, it is unnecessary for us to hazard a guess as to whether the *Wallace* case expresses the rule which today would be followed in the federal courts. For if it be conceded that in that case and each of the other cases cited by the defendant, the facts before the court justified the decision reached, it must, nevertheless, be observed that in no case has it been held that a railroad cannot, if it chooses, engage as a common carrier in the business of hauling circus trains, and it is hardly conceivable that such a conclusion could ever be reached. Consequently if a case were presented in which it appeared that a railroad had entered this field as a common carrier, the federal decisions above mentioned would no longer be in point and the case would be governed by the rule, which is equally well settled in the federal courts, that a common carrier acting as such cannot, by contract, relieve itself from liability for the negligence of itself or its servants. *Adams Express Co.* v. *Croninger*, 226 U. S. 491, 509 and cases cited; *New York &c. Railroad Company* v. *Lockwood*, 17 Wall. 357. We think that we have before us a case of that kind.

The sixth and final clause of the plaintiff's contract with the defendant concludes as follows: "And the show does hereby acknowledge that it had the option of shipping its Show, both persons and property at higher rates according to the Tariffs, Classifications and Rules of the Railroad and therefor receiving the security of the liability of the Railroad as a common carrier, but has voluntarily decided to ship the same under this contract at the reduced rates above named." Here indeed is a significant sentence the implications of which react with destructive effect upon the elaborate defense mechanism of the fifth clause. Although phrased as an acknowledgment by the shipper, the real acknowledgments and admissions therein contained are those of the railroad.

By the very act of inserting this clause in the contract, the railroad acknowledged its understanding of the fact that the limitations upon its liability contained in the preceding clauses of the agreement would be invalid unless the show company were given the option of making the shipment in question upon an alternative basis without limitation of liability. This can only mean that the railroad was contracting to render services as a common carrier, for if it were undertaking to do something wholly outside the scope of its duty as a common carrier, its freedom of contract would be unimpaired and the shipper would be entitled to no alternative proposal. Such a situation would

involve merely the "ordinary considerations of contractual relation." *Santa Fe &c. Ry* v. *Company*, 228 U. S. 177. Only when a common carrier acting as such seeks to secure relief from the liabilities imposed upon it by law in that capacity, is it necessary that the shipper be given an option as to the terms of his contract, the very purpose of offering such an alternative being to comply with the principle that no limitation of liability on the part of such a carrier is valid unless it was fairly and freely entered into. 4 R. C. L. Tit: Carriers, *s.* 243.

It is, however, in the language above quoted and the necessary implications thereof, that the most damaging admissions of the defendant are to be found. By offering to the show company the option therein described, the railroad asserted its willingness to accept as a common carrier the persons and property which were offered for transportation and conceded that they are proper subjects for shipment according to its "tariffs, classifications and rules." These words must be understood to mean the published tariffs, classifications and rules of the defendant filed according to law with the public service commission of New Hampshire and the interstate commerce commission, and the only inference which can be drawn from the preparation and publication of such regulations is that the railroad held itself out as a common carrier of shipments such as the show company offered for transportation in this case. Thereupon it became legally bound to accept and carry in that capacity shipments of the kind here involved and was legally prohibited from handling such shipments upon any other basis. The agreement of the parties in this case, therefore, stands revealed by its closing words as the contract of a common carrier by which it seeks, in consideration of a reduction in rates, to secure a release from the heavy responsibilities imposed by law upon such carriers, and as before stated, no such contract can be effective under the federal law to relieve a railroad from liability for the negligence of itself or its servants.

In the case of *Chicago &c. Ry* v. *Wallace, supra*, appears the following statement: "There was no evidence offered that the railroad company had ever carried similar goods for Wallace before in his own private cars, or that it had ever carried or held itself out to carry goods in that manner for others, and there is no presumption that railroad companies would do so." Here the court apparently overlooked the fact that the contract in that case contained the following reference to the rate charged for the service rendered: "(which said sum is a reduction from the usual and regular rates charged by said party of the first part for transportation services of the kind and

nature above specified)." A similar situation is disclosed in the case of *McCree* v. *Davis*, 280 Fed. Rep. 959, where it appears from the statement of facts that the "contract was made pursuant to Freight Tariff I. C. C. 5105, filed with the Interstate Commerce Commission May 29, 1918."

4. With reference to the suits of the other plaintiffs to recover damages for personal injuries and death, different considerations apply, but the result is equally plain. The Carmack amendment, by its terms, applies only to interstate shipments of property. "Its language is so clear as to leave no ground for the contention that Congress intended to deal with the transportation of persons." *Chicago &c. Ry* v. *Maucher*, 248 U. S. 359. The present situation in regard to a carrier's liability for injury to persons, therefore, parallels that which existed in regard to property before the Carmack amendment was passed and which has been described as follows: "Prior to that amendment the rule of carriers' liability, for an interstate shipment of property, as enforced in both Federal and state courts, was either that of the general common law as declared by this court and enforced in the Federal courts throughout the United States . . . or that determined by the supposed public policy of a particular State, . . . or that prescribed by statute law of a particular state . . ." *Lurton*, J. in *Adams Express Co.* v. *Croninger*, 226 U. S. 491, 504. In other words, the states are still free to apply their own statutes, regulations, policies and rules of law in determining the extent of a carrier's liability for personal injury and the validity of contractual limitations upon that liability in cases involving interstate as well as intrastate journeys. This being so, it is plain that the suits of the individual plaintiffs are controlled by the decision in *Wessman* v. *Railroad, supra*, and that the contract does not constitute a defence thereto. The question submitted for decision by the superior court, viz., whether the contract between the railroad and the show company "is a bar to the maintenance of all or any of the foregoing actions" is, therefore, answered in the negative.

*Case discharged.*

All concurred.