Strafford,
Sept. 6, 1938.

BERNARDI GREATER SHOWS, INC. *v.* BOSTON & MAINE RAILROAD.

MAYO WILLIAMS *v.* SAME.

MATILDA PADGETT, *Adm'x v.* SAME.

*Cooper & Hall, Robert W. Upton, Keefe & Varney* (*Mr. Hall* and *Mr. Cooper* orally), for the plaintiffs.

*Hughes & Burns* and *Conrad E. Snow* (*Mr. Snow* orally), for the defendant.

BRANCH, J. Upon the previous transfer of this case we were called upon to decide in advance of trial whether the special contract executed by the defendant and the show company constituted, in and of itself, a bar to the actions then before us for consideration. Our conclusion was that this contract did not as a matter of law constitute a defence to the actions then under consideration.

We had before us at that time only the plaintiffs' declarations and a copy of the contract. Under these circumstances it was impossible to place a final interpretation upon the language of the agreement. Such an interpretation in any case necessarily involves a consideration of all the evidentiary facts and the circumstances bearing thereon. *Barnard* v. *Insurance Co.*, 88 N. H. 292, 293; *Kann* v. *Company*, 85 N. H. 41, 47, 48. The facts and circumstances which throw light on the meaning of the contract now appear in the record before us and in view thereof the defendant contends that the conclusions previously reached should be revised. There appears to be much merit in this contention.

The conclusion which we previously drew from the language of the agreement that the defendant contracted as a common carrier to haul the show train now appears to be untenable. This conclusion was based upon the provisions of the contract in which the show company purported to acknowledge that "it had the option of shipping its Show, both persons and property at higher rates according to the Tariffs, Classifications and Rules of the Railroad and therefor receiving the security of the liability of the Railroad as a common carrier." We then felt that this language postulated the existence of "Tariffs, Classifications and Rules" by which the defendant "held itself out as a common carrier of shipments such as the show company offered for transportation in this case." *Bernardi Greater Shows, Inc.* v. *Railroad*, 86 N. H. 146, 158. The defendant's published tariffs are now before us, and it clearly appears that there was not in existence when this contract was executed any tariff covering the movement of circus or show trains as unit shipments. From these tariffs and the testimony at the trial it is plain that the reference in the contract to "Tariffs, Classifications and Rules" was to the classified rates of the defendant applicable to the transportation of the various items of personal property making up the equipment of the show when carried under uniform bills of lading upon the defendant's regular freight trains and to the published rates for the transportation of persons as passengers upon its regular passenger trains. Under these rates animals classified as animals would take a specified rate; wagons as wagons would take another rate, and persons transported on passenger trains would pay the usual passenger rates. The cost of such transportation under these conditions would be five times as much as under the special contract here involved and the show would not in that event be moved as a unit. The fact that the railroad thus expressed its willingness to haul the property of the show as ordinary freight in its regular trains does not justify the inference that it professed its willingness as a common carrier to haul circus and show trains as special units.

We cannot accept at its face value, however, the declarations in the contract that the railroad did not contract "as a carrier, either common or special . . . but as a hirer to the show of the cars and motive power and of men to operate the same, and of the right to use the road and tracks of the railroad." *Ib.*, 148, 149. We adhere to our previous opinion that the defendant by this form of words asserted an entirely fictitious relationship between itself and the show company. It seems plain to us that the contract was an agreement for the

transportation of the show train as a unit, but it now appears that this was a service outside the scope of the defendant's assumed obligations as a common carrier. We therefore conclude that in making this agreement the defendant contracted as a private carrier to render a service in regard to which the parties "were free to make their own bargain," *Santa Fe &c. Railway Co.* v. *Company*, 228 U. S. 177, 185, 188.

Confirmation of this view is found in the evidence that this contract was filed as a special tariff with the Interstate Commerce Commission in accordance with a rule of the commission which reads as follows: "63. TRANSPORTATION OF CIRCUS OUTFITS (Issued March 18, 1907).— The act to regulate commerce, as amended June 29, 1906, applies to the transportation of circuses and other show outfits, but the Commission recognizes the peculiar nature of this traffic and the difficulty of establishing rates thereon in advance of shippers' request describing the character and volume of the traffic offered, and has therefore entered a general order authorizing carriers to establish rates on circuses and other show outfits by tariff, to become effective one day after filing thereof with the Commission, and relieving them from the duty of posting such tariffs in their stations. Such tariff may consist of a proper title page reading 'as per copy of contract attached' and to it may be attached a copy of the contract under which the circus is moved. As far as practicable general rules or regulations governing the fixing of such rates should be regularly published and filed." The evidence was unquestioned that for many years the defendant has been accustomed to file with the commission, in accordance with this rule, contracts similar to the one here involved and that similar contracts were in use by other railroads. It therefore seems plain that the propriety of such special contracts has for a long time been recognized by the administrative agency charged with the enforcement of the federal law, and as pointed out in the former opinion the validity and binding effect of such contracts have been uniformly sustained by the federal courts, if not always upon grounds which compel agreement. From the foregoing considerations it follows that the contract of the show company is a valid and enforceable agreement, that the release of the defendant from liability therein contained is a bar to the action of the show company, and that in the first case now under consideration there should be judgment for the defendant. By the same token the show company is bound to indemnify the railroad against liability for damages to persons rightfully riding upon the train, and property transported thereon.

The question whether the contract of the show company furnishes a defence to the actions of the individual plaintiffs remains to be considered. Both Padgett and Williams were employees of one David Stock, a concessionaire, who operated certain amusement devices in connection with and as a part of the Bernardi shows under a contract which provided that the Bernardi company should receive a percentage of the gross receipts from the Stock devices and should furnish transportation for the concessionaire, his property and employees. Under these circumstances it is argued on behalf of the individual plaintiffs that they had no contractual relations with the defendant and were in no way bound by the provisions of the show company's agreement. The defendant replies that if this is so it follows that Williams and Padgett were trespassers on the train to whom the defendant owed no duty of care.

This contention cannot be adopted. The defendant contracted to "transport the show, show material, show animals, apparatus and paraphernalia, and persons in charge thereof, employees and performers." If the defendant was not apprised of the composite character of "the show" traveling under the name of Bernardi Greater Shows, Inc., there is nothing to indicate that this fact was or would have been regarded as of importance if it had been fully disclosed at the time when the contract was executed. The railroad was willing to haul the show train as a unit. Williams and Padgett were "persons in charge" of a portion of the "show material ... apparatus and paraphernalia", actually on the train. The questions of the legal title to the property or the precise legal relationship between the show company and the people who were permitted to ride thereon do not appear to have been regarded as significant by either party.

The probability that people other than the employees of the show company might be on the train was recognized, moreover, by the fifth clause of the contract in which the show agreed to indemnify the railroad against all claims for damages "which may be sustained to the property of the Show or to any property in its use or charge or to the person or property of any of its agents, servants, performers or employees while on or about said road or the premises of said Railroad, or to the person or property of any of those who may come upon said road or said premises, because of the presence there of the Show, or its agents, servants, performers or employees, whether in any case occasioned by the negligence of the Railroad, its agents or servants, or otherwise, and whether occurring during the transportation of the Show or before, after or between runs."

Under these circumstances we have no hesitation in holding that the employees of the concessionaires who were traveling on the train under an agreement with the show company were invitees of the railroad to whom it owed the duty of exercising reasonable care. Their claims may be said to rest not upon the contract of carriage but upon the general right of human beings not to be injured by the negligence of another. *Chicago &c. Railroad* v. *Maucher*, 248 U. S. 359. The railroad knew that the "show" consisted in part of human beings who would be traveling on the train. To avoid injury to such people it was bound to exercise reasonable care and this duty was in no way dependent upon the existence of a master and servant relation between them and the show company.

The law of landlord and tenant furnishes a suggestive analogy. Persons who enter the common passageways of a building as business visitors of the tenants therein are said to enter in the right of the tenant and to them the landlord is held to owe the same duty of care for their protection as he owes to his tenants. They are therefore entitled to recover for injuries caused by negligence on the part of the landlord under the same circumstances which would permit a recovery by the tenant. See *Domenicis* v. *Fleisher*, 195 Mass. 281. In that case the precise analogy to which we have referred is pointed out by *Loring*, J., as follows: "There is the same difference in case of a contract for transportation by a carrier and the relation which comes into existence when the transportation once has begun. If, for example, the head of a family should make a contract with a common carrier for the transportation of himself, his family and servants from one place to another, the carrier would not be liable to any one but the head of the family for refusing to enter upon the transportation. But ... when the transportation once has begun the carrier comes under the relation of a carrier for hire; and he comes under this relation not only to the party to the covenant but to each person who is received by him (the carrier) as a passenger under that covenant; and if there is on his part a breach of the duty owed by a carrier to a passenger for hire, the carrier can be sued in tort by any one of those persons." We therefore conclude that Williams and Padgett were upon the show train not as trespassers but as invitees of the Railroad. It does not follow from this conclusion, however, that they were parties to the show company's contract with the railroad or that they were bound by the terms thereof.

In the language of the Court of Appeals of New York "it is not seen how" Williams or Padgett "could, without his knowledge or con-

sent, be placed in such relation to the defendant as to relieve it from liability to him of the consequences of its negligence affecting him personally." *Brewer* v. *Railroad*, 124 N. Y. 59, 64. Although they must have understood that they were allowed to ride on the train pursuant to some arrangement of their employer with the show company and may have understood that the show company had a special contract with the defendant, it cannot be said as a matter of law that they were therefore chargeable with notice of all the provisions of both contracts or that by accepting transportation with knowledge of such provisions they released the defendant from the consequences of its failure to exercise reasonable care for their protection. *Brewer* v. *Railroad, supra.* This conclusion is in accordance with the clear intimation of the opinion in *Baker* v. *Railroad,* 74 N. H. 100, 112.

We do not ignore the existence of cases in which a different conclusion has been reached, such as *Cleveland &c. Railroad Co.* v. *Henry,* 170 Ind. 94, and *Sasinowski* v. *Railroad,* 74 Fed. (2d) 628, but we do not regard as convincing the reasons therein stated for the results reached. In fact, the court in the case last cited declined the task of stating what it regarded as a sound basis for its conclusion. After noting the conflict of authority and quoting from the *Henry* case, *supra,* it brushed aside the whole difficulty in these words: "Whatever may be the correct rule in this respect, we think the contract between the Show and the railroad was a valid one, and the rights of the plaintiff's intestate must be determined under it."

Since the suits of the individual plaintiffs are not barred by the contract of the show company, it becomes necessary to consider the contention of the defendant that there was no evidence to support a finding that the accident was caused by its negligence.

Three claims of negligence were advanced by the plaintiffs: (1) inadequate inspection of the train before it left Lakeport; (2) inadequate road bed on the Lakeport Branch where the accident occurred; (3) excessive speed of the train.

It is abundantly clear that the derailment of the cars upon which Williams and Padgett were riding resulted from the breaking apart of the train which immediately preceded it. It is equally clear that the train broke apart because the draw bar in the rear of Bernardi flat car number 12 pulled out. This latter occurrence became possible by reason of the absence of the cross-key which is designed to hold the draw bar in place but which appears to have come out at a point some two thousand feet from the place of the accident, where it was

subsequently found by the defendant's agents. The plaintiff contends that the cross-key could not have come out if proper key-retainers had been in place when the train left Lakeport, that proper inspection at that point would have disclosed their absence on car number 12, and that the inspection actually made by the defendant was shown to have been negligently performed. One answer of the defendant is that by the terms of its contract with the show company the latter agreed that "each car and the contents thereof shall be of a character and in order suitable for such movement," that the duty of inspection therefore rested upon the show company, and hence that the defendant was under no duty to inspect.

This answer cannot be accepted as absolving the railroad from liability. The evidence fully justified the finding that the railroad had not only assumed the task of inspecting this train at the termini of every movement over its lines but had insisted on making its own inspection before any movement was commenced and that it caused two inspections to be made while the train was at Lakeport. From these facts it might be found that the defendant was under a duty to provide an adequate inspection.

From the report of the second inspection at Lakeport and the testimony of the inspector it might be found that only eighteen cars were inspected, whereas the Bernardi train consisted of nineteen cars. From this evidence a finding of incomplete inspection might be made. There was also evidence that an examination of the uninjured cars after the accident disclosed defective key-retainers on several other cars, which a careful inspection would have disclosed. From this and other evidence in the record we conclude that a finding of inadequate inspection might properly be made.

The question of causation presents greater difficulty but cannot be decided adversely to the plaintiffs as a matter of law. Three different types of cross-key retainers were introduced as exhibits and their operation was explained in detail to the jury. From this evidence we think it was a permissible conclusion that if proper retainers had been in place when the train left Lakeport they could not have worked out during the journey of twenty-eight miles to the scene of the accident. As a corollary of this conclusion, it would follow that proper retainers were not in place when the train started, and the evidence clearly indicated that a proper inspection should have disclosed such a situation. We therefore conclude that the issues of inadequate inspection and its causal effect were properly submitted to the jury.

In regard to the claims of defective roadbed and excessive speed, the defendant argues that neither factor if established by the evidence had anything to do with the accident. The defendant earnestly contends that the cause of the derailment was definitely shown to have been the falling draw bar from car number 12 and that the issues of defective roadbed and excessive speed should have been withdrawn from the jury in accordance with its motions.

Although the evidence lends much force to this argument, it does not compel its acceptance. The plaintiffs introduced in evidence the testimony of a civil engineer of many years' experience in the construction and operation of steam railroads who was permitted to testify as an expert concerning the cause of the derailment. He testified that the roadbed of the Lakeport Branch, while suitable for ordinary branch line traffic, was too light for a heavy train traveling at high speed and gave it as his opinion in answer to a hypothetical question that the derailment was caused by the spreading of the rails after the train broke in two. His explanation was that the breaking of the air hose caused an emergency application of the brakes on the rear section of the train which took effect first on the leading car of that section, with results which he described as follows: "When that application of air was made on the head car, it checked that car, and the momentum and the force of the heavy train behind this car had a jamming effect against the head car, followed up in immediate succession by the second and third car as the brakes were applied, and the rear end of the train hammered through, and that in my opinion, due to the rigid trucks and the long length of these cars, and the fact that you were no longer pulling that train from the head but it was being pushed from behind, exerted that force on the front car, shoved it over to the high side of the track, spread the rail out, the wheels dropped in, and they continued along and with the force behind that train, instead of pulling it, it buckled that first car and it went across to the right, the second car followed and buckled across to the left, and the other two cars went into the middle of the first two cars and stopped off the iron but in line with the location of the track, and the fifth car was derailed with the front trucks —the rear trucks still on the iron." According to the testimony of this witness, the curve in the track at the point of the accident, the character of the roadbed and the speed of the train were all factors which combined to bring about the derailment.

Under the rule now firmly established in this state the admission of this testimony was not error as a matter of law. *Higgins* v. *Car-*

*roll*, 86 N. H. 312, 315; *Goldstein* v. *Corporation*, 86 N. H. 402, 404; *Christie* v. *Company*, 87 N. H. 236, 239; *Perreault* v. *Company*, 87 N. H. 306, 310; *Gallienne* v. *Company*, 88 N. H. 375, 382.

The foregoing evidence having been admitted by the court, the question of causal relationship between the alleged defects in the roadbed plus the speed of the train and the derailment, was properly submitted to the jury.

Defendant's exceptions to the admission and exclusion of evidence do not merit individual consideration. The foregoing discussion has indicated the propriety of many of these rulings and the immateriality of others in view of the conclusions reached upon the controlling issues of liability. In regard to the exceptions not thus covered it is sufficient to say that they have been examined with care and no reason for disturbing the verdicts of the jury has been found therein.

Defendant's exceptions to the allowance of the argument of plaintiffs' counsel, to the denial of its requests for instructions and to the charge have not been argued and are assumed to have been waived.

*In the action of Bernardi Greater Shows, Inc.,*
*judgment for defendant.*

*In the actions of Williams and Padgett, Adm'x,*
*judgments on the verdicts.*

All concurred.