CHICAGO & N. W. RY. CO. v. DAVEN-
PORT et al.
No. 14300.

United States Court of Appeals
Fifth Circuit.

June 26, 1953.

Rehearing Denied Aug. 11, 1953.

Strum, Circuit Judge, dissented.

See also D.C., 95 F.Supp. 469.

Arthur P. Bagby and J. Sam Winters,
Austin, Tex., Drennan J. Slater and Gerald
M. Chapman, Chicago, Ill., for appellant.

John J. McKay, Austin, Tex., Denver E.
Perkins, Gonzales, Tex., for appellees.

Before HOLMES, STRUM and RIVES, Circuit Judges.

RIVES, Circuit Judge.

By this action the appellant, Chicago and North Western Railway Company (hereinafter called the Railroad) seeks to recover from the appellee partners and from Dailey Bros. Circus, a partnership, (hereinafter called the Circus) under an indemnity agreement in a contract providing for the haulage of the Circus' train over the Railroad's line. The questions in dispute involve the construction and validity of the contract provisions for indemnity.

The Circus operated a road show traveling in 25 railroad cars owned by an affiliated company and leased to the Circus. The show traveled from its winter quarters at Gonzales, Texas, northward, to Canada. From there it reentered the United States in August, 1950, intending to play various towns in the states of Michigan and Wisconsin. In furtherance of such intention, the Circus entered into a contract with the Railroad at Chicago, Illinois, dated July 20, 1950, providing for the transportation of the "Circus, Menagerie or Show Outfit, equipment, and employees" in the 25 cars of the Circus "from Ishpeming, Michigan, to Watertown, Wisconsin, with the privilege of stopping for exhibition" at various designated towns on the line of the Railroad, the period of transportation to cover from August 10, 1950 to August 26, 1950. The portions of this contract most material for purposes of this case are contained in Sections 1, 3 and 6, which are as follows:

"1. That it is mutually understood and agreed that the Railroad is not a common carrier of circuses or show outfits, or cars and equipment carrying the same, and has never held itself out as such; and that it enters into this agreement as a Special carrier only, and not as a common carrier.

\* \* \* \* \* \*

"3. All equipment presented by party of the second part for transportation hereunder shall be in proper, good and sufficient condition and shall be provided with all devices required by law and party of the second part shall keep the same in such condition during the continuance of this contract, and it shall contain no powder, fireworks, or explosives, or any animals to be transported in violation of any Federal, State or Municipal laws, rules, regulations or requirements. Party of the first part shall have the right to inspect at any time all or any of such equipment or contents and exclude the same from the benefit of this contract; but this provision shall not be held to cast upon the party of the first part the duty to so inspect nor any liability for failure to do so or to report defects.

\* \* \* \* \* \*

"6. The liability of the respective parties hereto as to all persons and property transported or to be transported in pursuance of this agreement, or coming upon the premises of the railroad company in connection therewith or otherwise in connection with the business of party of the second part, shall be governed by the provisions hereof, and in that behalf it is agreed that this contract is not made with the said railway company as a carrier, either common or special, of the said persons or property of any thereof (the compensation to be paid by said party of the second part being wholly inadequate consideration for any such undertaking), but as a hirer to the party of the second part of the motive power and equipment and of men to operate the same, and of the right to use the road and tracks of the said railway company, to the extent necessary in the premises, and that the conductors, engineers, trainmen, and other officials, agents or employees furnished by the said railway company hereunder shall, for all purposes of this contract, while engaged in such employment, be deemed to be the servants of the party of the second part, and to be operating said motive power and equipment under the orders, direction and control of the party of the second part; and party of the second part hereby fully releases and discharges the said railway company from, and agrees that the said

railway company shall not be liable to the said party of the second part, nor to any person or persons, for any injury or damage which may happen to any persons, cars or property to be or which may be transported hereunder, or otherwise may be upon said train or upon the railway company's premises, which may be caused by any defect in the railroad tracks or premises of party of the first part or unsuitableness thereof for such transportation or by the negligence of said conductors, engineers, trainmen, or other officials, agents, or employees of the railway company, or any or either of them, or arising from any cause whatsoever. Party of the second part hereby further covenants and agrees to protect, indemnify and forever hold free and harmless the said party of the first part from any and all liability, loss, judgments, costs and expenses whatsoever, arising from or in connection with claims or suits for damages on account of any such injury or damage."

In the course of the agreed transportation, on August 16, 1950, about 9:00 o'clock in the morning, the Circus train, including a circus car known as car 83, entered Antigo, Wisconsin, over the Railroad's line. One of the Railroad's general employees, Chester Hugunin, a switchman acting in the course of his employment, climbed car No. 83 and fell and was seriously and permanently injured when the grab-iron, located on the roof of the car, came loose because it was insecurely attached.

Hugunin asserted his claim against the Railroad pursuant to the terms of the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60, and the Safety Appliance Act, 45 U.S.C.A. §§ 1–16. The Railroad gave notice of liability over and tendered defense of the claim to the Circus, but it refused to defend and denied any liability under its contract. The Railroad later settled Hugunin's claim by paying to him and for his use and benefit the aggregate sum of $31,-349.16, which amount it seeks to recover from the Circus in this action. It was stipulated that the liability of the Railroad to its employee was clear and that a defense to his claim on the merits would have been unavailing. It was further stipulated that the settlement was just and fair, and was a reasonable and prudent compromise made in good faith.

At the conclusion of the trial, the District Court entered full findings of fact and conclusions of law and judgment for the defendants on the grounds that the indemnity provisions of the contract were inapplicable to Hugunin's claim, and that, if they were applicable, the contract was void as against public policy. Among the facts found by the District Court were the following:

The Railroad is a common carrier by rail of freight and passengers for hire. The Circus was not a railroad nor a common or specialized carrier for hire and made no charge to its employees or other persons riding on the Circus train. The Circus employed no personnel to operate its railroad rolling stock or to make inspection or repairs of the same, which facts were well known to the Railroad. In the Spring of 1950, as had been customary in previous years, the Texas & New Orleans Railroad, serving Gonzales, Texas, the winter quarters of the Circus, made extensive inspections and repairs of the Circus rolling stock at the expense of the Circus, and thereafter hauled the same over its lines on the first trip of the season. As the Circus continued its itinerary, its rolling stock was inspected by the various receiving railroads and when repairs appeared necessary, they were made and the cars serviced from time to time at the cost of the Circus, but by employees of the railroad over whose lines the circus was then being transported. Insofar as movements over the appellant's rail lines were concerned, the Railroad personnel charged with the duties of inspecting, moving and handling the train were in fact the employees of the Railroad responsible to their superiors in all matters and the Circus neither had nor attempted to exercise any control over the dispatching of the train, its rail movements or switching operations; gave no instructions to the Railroad employees and had no control over them nor over the motive power. The Circus relied

upon the Railroad to make proper inspections of the cars and to make repairs thereto and stood currently ready to compensate the Railroad for the cost of any such repairs. The Railroad "assumed the duty of making necessary inspections, and reserved the right to reject any of such rolling stock which was in a defective condition". So far as the injured employee, Chester Hugunin, was concerned, the defective grab-iron was a latent defect, but, if the car and grab-iron had been subjected to any inspection by the Railroad, other than by Hugunin himself who tested the grab-iron by pulling on it, the nature of such inspection was not shown by the evidence. The Circus was not offered by the Railroad any alternative contract for the transportation of its rolling stock, personnel and property. The transportation charges, $12,625, exclusive of federal taxes, were made at levels resulting in a profit to the Railroad, and there was no evidence that the rates were in fact reduced. The various railroads, with which the Circus had dealt, generally solicit the business of transporting the Circus train. Appellant Railroad holds itself out to perform the service of transporting circus trains using the railroad engines, tracks, facilities and crews, and, in the State of Wisconsin alone, during the years 1949 and 1950, as evidenced by filed tariffs, it transported eleven circus outfits over its lines in that State. The contract between the Railroad and the Circus was filed with the Public Service Commission of Wisconsin, and it may be added to the facts found by the District Court that the contracts for the transportation of other circus outfits which appear in the record show that such contracts were filed not only with the State Commission but also with the Interstate Commerce Commission, and were stated to be "issued under authority of Rule 63, Tariff Circular 20, of the Interstate Commerce Commission". (See Footnote 1, infra).

Among the conclusions of law of the District Court were the following:

"It is the rule in Texas that 'to undertake to do an act forbidden by the law of the place where it is to be done is an invalid agreement, and imposes no legal obligation'"; citing Miller v. Long-Bell Lumber Co., 148 Tex. 160, 222 S.W.2d 244, at page 246. The places of performance being named, the parties contracted with reference to the laws of those places, i. e., the states of Michigan and Wisconsin as distinguished from the *lex loci contractus*; citing Cockburn v. O'Meara, 5 Cir., 141 F.2d 779; 9 Texas Jur., § 10, p. 362; 11 Am.Jur., Conflict of Laws, § 19, p. 407; Annotation, 72 A.L.R. p. 250. The laws of Wisconsin, therefore, control as to the construction and validity of the contract. Further, a state will not lend the aid of its courts to the enforcement of a foreign contract violative of the public policy of the forum; citing Griffin v. McCoach, 313 U.S. 498, 61 S. Ct. 1023, 85 L.Ed. 1481; Annotation, 134 A. L.R. 1462, 1468. The circumstances of the transaction and the actual relations of the parties show that Hugunin was in no sense an employee of the Circus and the provisions in the contract which seek by declaration to make the Railroad's employees the employees of the Circus are ineffective. Indemnity agreements are strictly construed against the indemnitee; citing Halliburton Oil Well Cementing Co. v. Paulk, 5 Cir., 180 F.2d 79; 27 Am.Jur., Indemnity, § 15, p. 464. So construed, this contract does not include, among those against whose claims the Circus is to indemnify the Railroad, the Railroad's own employees. Assuming, however, that the contract is subject to such construction, it is invalid. The Interstate Commerce Commission exercises jurisdiction over the transportation of circus outfits whether by rail or by truck; citing Code of Fed.Regs. (1949), Title 49, Chapter 1, Secs. 141.63 and 145.63[1]. The Railroad, as

---

1. Code of Federal Regulations (1949), Title 49—Transportation, Chapter 1—I. C. C.

As applicable to freight service (railroads):

"Sec. 141.63. *Transportation of Circus Outfits.*

"Rates for specified movements of circuses and other show outfits may be established on not less than 1 day's notice to the commission. Such tariffs must bear reference to this rule and must publish the charges specifically, showing the number and kind of cars moved, or may consist of a proper title page reading 'as per copy of contract attached', and to

a common carrier of passengers and property, is subject to all of the provisions of the Federal Safety Appliance Act, 45 U.S. C.A. § 1 et seq., and its duty to comply with this Act is absolute. The contract attempts to indemnify the Railroad against its breach of the Safety Appliance Act and such a contract is invalid; citing 74 C.J.S., Railroads, § 425(a), p. 1000; Elliott on Railroads (3rd. ed.), Vol. 1, Sec. 443, p. 680; 27 Am.Jur., Indemnity, §§ 9, 11, pp. 460, 461; Restatement, Contracts, §§ 574, 575; Annotation, 175 A.L.R. p. 12; 6 Williston on Contracts, § 1751, p. 4960; 10 Texas Jur., § 107, p. 185. The indemnity provisions of the contract are invalid under the laws of Wisconsin; citing Wisconsin Statutes (1947), Chapter 192, Secs. 192.42 and 192.-43. The District Court was doubtful as to whether such a contract would be valid in the State of Illinois; citing Crane v. Railway Express Agency, Inc., 369 Ill. 110, 15 N.E.2d 866. In the State of Texas railroads are declared public highways, railroad companies common carriers, and as such prohibited from restricting their liability, and under the laws of Texas the contract of indemnity would have been invalid; citing Article 10, Sec. 2 of the Texas Constitution, Vernon's Ann.St., Articles 882, 883 and 6474 et seq., Vernon's Ann. Civil Statutes of Texas; 8 Texas Jur., § 64, pp. 118, 119; § 797 et seq., p. 1135 et seq.; Rowe v. Colorado & S. R. Co., Tex.Civ. App., 205 S.W. 731. The District Court concluded that the contract violates the letter and spirit of the pertinent laws and decisions referred to, is contrary to public policy, and void, and entered judgment for the defendants.

 Appellant Railroad, in an effort to avoid the unfavorable effect on it of the

laws of Wisconsin, and also of Illinois and Texas, as ruled by the District Court, insists that federal law is determinative of this case, that the Railroad is subject to the provisions of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., that the Carmack Amendment to that Act, 49 U.S.C.A. § 20 (11), regulates the carrier's power to limit its liability for the carriage of property in interstate commerce, and, manifests such a comprehensive plan that there is no room for state regulation, citing American Express Co. v. United States Horseshoe Co., 244 U.S. 58, 37 S.Ct. 595, 61 L.Ed. 990; Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314, and that the case of Chicago, R. I. & Pac. Ry. Co. v. Maucher, 248 U.S. 359, 39 S.Ct. 108, 63 L. Ed. 294, relied upon by the District Court, is inapplicable. Thus far, we find ourselves in agreement with the appellant Railroad. In the Maucher case, supra, the injured person was a circus employee whose transportation was provided for by the contract. The reason for holding that the Carmack Amendment had not dealt with that particular subject were thus stated:

"But the Carmack Amendment deals only with the shipment of property. Its language is so clear as to leave no ground for the contention that Congress intended to deal with the transportation of persons." 248 U.S. at page 363, 39 S.Ct. at page 108.

In the present case, the injured person was not transported under the contract, but was an employee of the Railroad. Any provision for indemnity against liability for injuries to the Railroad's own employees was exacted by the Railroad as a condition to its acceptance of the shipment of the property provided for in the contract, and

it may be attached a copy of the contract under which the circus is moved. Tariffs containing such rates need not be posted at stations. As far as practicable, general rules or regulations governing the fixing of such rates should be regularly published, posted and filed upon statutory notice."

As applicable to motor carrier service (trucks), the same regulation is made, the first sentence, however, reading as follows:

"Sec. 145.63. *Transportation of circus outfits.*

"The Interstate Commerce Act applies to the transportation of circuses and other show outfits, but the Commission recognizes the peculiar nature of this traffic and the difficulty of establishing rates thereon in advance of shippers' request describing the character and volume of the traffic ordered, * * *."

is within the reach of the Carmack Amendment. The distinction between claims arising out of the transportation of persons and the carriage of property is well illustrated by the decisions of the New Hampshire Court in Bernardi Greater Shows v. Boston & M. R. R. Co., 86 N.H. 146, 165 A. 124; second appeal 89 N.H. 490, 1 A.2d 360. The doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, "is inapplicable to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law." Sola Electric Co. v. Jefferson Co., 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165. We look, therefore, to the federal law to determine the validity of the indemnity provisions of the contract.

It is questionable whether the contract should be construed to cover indemnity for damages paid on account of injury suffered by railroad employees. So far as we know, this is the first case seeking such a holding. Similar contracts have heretofore been applied defensively by the railroad to escape liability for damages either to circus property or to circus personnel [2]. However, the contract does provide that the Railroad's employees shall be deemed the employees of the Circus while working on the Circus' train, and, for purposes of this decision, we will assume that it is broad enough to provide for indemnity for damages paid on account of injuries suffered by the Railroad's own employees, and pass to a consideration of the validity of such a provision.

We are not able to follow the learned district judge in holding that, so

construed, this is a contract by which the Railroad seeks to exempt itself from liability created by the Federal Employers' Liability Act or the Federal Safety Appliance Act and, hence, void under 45 U.S.C.A. § 55. The Railroad did not seek to escape liability to its employee. To the contrary, it settled with him fairly and honorably. The contract, construed as contended for by Appellant Railroad, seems to us to provide for indemnification and not for a limitation of liability. See Sager v. Northern Pac. Ry. Co., C.C., 166 F. 526; Sinclair Refining Co. v. Stevens, 8 Cir., 123 F.2d 186; Cacey v. Virginian Ry. Co., 4 Cir., 85 F.2d 976; Northern Pac. Ry. Co. v. Thornton Bros. Co., 206 Minn. 193, 288 N.W. 226; Gaulden v. Southern Pac. Co., D.C.N.D.Calif., 78 F. Supp. 651, 655, 656, affirmed 9 Cir., 174 F. 2d 1022. We quote from the case last cited:

"It is suggested that the so-called indemnity clause of the Protective Service Contract amounts to a violation of Section 5. But inasmuch as this clause is one merely of indemnity, it does not have the effect of exempting the railroads from their liability as common carriers under the Act. Hence in no sense may it be considered a violation of Section 5."

Appellant Railroad relies upon the principle that, when a railroad company is acting outside the performance of its duty as a common carrier, " * * * it is dealing with matters involving ordinary considerations of contractual relation; those who choose to enter into engagements with it are not at a disadvantage; and its stipulations even against liability for its own neglect are not repugnant to the requirements of its public service." Santa Fe P.

2. Chicago, M. & St. P. R. Co. v. Wallace, 7 Cir., 66 F. 506, 30 L.R.A. 161, circus property; Wilson v. Atlantic Coast Line R. Co., C.C., 129 F. 774, damage to circus cars and property; Clough v. Grand Trunk Western Ry. Co., 6 Cir., 155 F. 81, circus employee; Sager v. Northern Pac. Ry. Co., C.C., 166 F. 526, circus employee; McCree v. Davis, 6 Cir., 280 F. 959, circus employee; Sasinowski v. Boston & M. R., 1 Cir., 74 F.2d 628, circus employee; Maucher v. Chicago, R. I. & P. Ry. Co., 100 Neb. 237, 159 N.W. 422, circus employee; Bernardi Greater Shows v. Boston & M. R. R., 86 N.H. 146, 165 A. 124, second appeal 89 N.H. 490, 1 A.2d 360, circus property and employees of concessionaries; Dierickx v. Davis, 80 Ind.App. 71, 137 N.E. 685, circus employees; Robertson v. Old Colony R. Co., 156 Mass. 525, 31 N.E. 650, circus employee; Forepaugh v. Delaware, etc. R. Co., 128 Pa. 217, 18 A. 503, 5 L.R.A. 508, circus property; Sabol v. Chicago & N. W. Ry. Co., 255 Mich. 548, 238 N.W. 281, circus employee.

& P. Ry. Co. v. Grant Bros. Construction Co., 228 U.S. 177, 185, 33 S.Ct. 474, 477, 57 L.Ed. 787; see also 9 Am.Jur., Carriers, Sec. 737. In a number of cases in the federal courts that principle has been applied to provisions in contracts between railroad companies and circuses stipulating against liability for damage in hauling the circus' special train, the railroad company being held in such cases to act as a private and not as a common carrier. Sasinowski v. Boston & M. R. R., 1 Cir., 74 F.2d 628; McCree v. Davis, 6 Cir., 280 F. 959; Sager v. Northern Pac. Ry. Co., supra; Clough v. Grand Trunk Western Ry. Co., 6 Cir., 155 F. 81; Wilson v. Atlantic Coast Line R. Co., C.C., 129 F. 774; Chicago M. & St. P. R. Co. v. Wallace, 7 Cir., 66 F. 506, 30 L. R.A. 161. None of those cases, however, involved a finding of fact as here, that the Railroad was actually operating as a common carrier of Circus property and was soliciting and holding itself out to perform such service. The present case presents the situation envisioned by the Supreme Court of New Hampshire in Bernardi Greater Shows v. Boston & M. R. R. Co., 86 N.H. 146, 165 A. 124, 131, when it said that,

> "* * * if a case were presented in which it appeared that a railroad had entered this field as a common carrier, the federal decisions above mentioned would no longer be in point, and the case would be governed by the rule, which is equally well settled in the federal courts, that a common carrier acting as such cannot, by contract, relieve itself from liability for the negligence of itself or its servants."

9 Am.Jur., Carriers, § 37, states the rule as follows:

> "Whether a particular transportation service is undertaken in the capacity of a private or of a common carrier must be determined by reference to the character of the business actually carried on by the carrier, and also by the nature of the service to be performed in the particular instance. * * *"

See also, 13 C.J.S., Carriers, § 3a, p. 26, note 11; Brignoli v. Seaboard Transportation Co., 29 Cal.2d 782, 178 P.2d 445, 451; Sea Ins. Co. v. Sinks, 7 Cir., 166 F.2d 623; cf. United States v. California, 297 U.S. 175, 181, 56 S.Ct. 421, 80 L.Ed. 567; First National Stores v. H. P. Welch Co., 316 Mass. 147, 55 N.E.2d 200, 201.

■ The interstate Commerce Commission has declared that the Interstate Commerce Act applies to the transportation of circus outfits. Code of Fed.Regs., Title 49, Secs. 141.63, 145.63, quoted in part in Footnote (1), supra. The provisions of the Interstate Commerce Act apply generally to common carriers by railroad. 49 U.S.C.A. §§ 1, 3, 15; Chicago, M. St. P. & P. R. Co. v. Campbell River Mills Co., 9 Cir., 53 F.2d 69, 72; West's Key Numbered Federal Digest, Commerce, ⊂85(3)n. The Commission dealt with a related problem in Chappelle v. Louisville & N. R. R. Co., 19 I.C.C. 56, 19 I.C.C. 456. In the latter opinion, in speaking of the railroad's contention, that it acted as a private carrier in transporting the cars of a negro minstrel troop, Commissioner Lane, speaking for the Commission, said:

> "If it is a private carrier as to private cars or any class of private cars, it may carry such cars free of charge or at any rate that it may choose, differing and distinguishing between each party or car that it carries. Such construction of the law absolutely nullifies it as to all private equipment, whether carrying passengers or freight. A carrier may no doubt lawfully refuse to carry certain classes of private equipment, but it may not distinguish between private cars that are owned by negroes and private cars that are owned by whites, nor may it discriminate between private cars that are owned by Armour & Company and private cars of the same class that are owned by any other concern." (19 I. C.C. 456, 457.)

See also Commissioner v. St. L. S. F. R. Co., et al., 74 I.C.C. 400. It seems to us that the filing of the contract by the Railroad with the Interstate Commerce Commission along with the statement that it was "issued under authority of Rule 63, Tariff Circular 20, of the Interstate Commerce Commission" was a virtual recognition by the Rail-

road that it was acting as a common carrier whose rates were subject to regulation by the Interstate Commerce Commission.

If the appellant Railroad occupied the status of a common carrier subject to the provisions of the Interstate Commerce Act, then it is patent that the spirit and prohibitions of that Act would avoid the provisions of this contract insofar as it provides indemnity for injuries to the Railroad's own employees[3]. Indeed appellant Railroad does not, and reasonably cannot, contend that in its capacity as a common carrier it can require a shipper to indemnify it against injuries to its employees.

Under the findings of fact of the District Court, which we find amply supported by the record, the appellant Railroad acted as a common carrier in the transportation of the Circus and hence, is not entitled to indemnity against the damages paid by it on account of the injuries suffered by the Railroad employee. The judgment of the District Court is, therefore,

Affirmed.

STRUM, Circuit Judge, dissents.

Rehearing denied; STRUM, Circuit Judge, dissenting.

3. See 49 U.S.C.A. § 1, Duty to Transport; Sec. 3, Avoidance of Preferences; Secs. 8 and 9, Liability to Those Damaged; Sec. 10, Discrimination and Violation of Commission Regulations; Sec. 20(11), Limitation of Liability.