**ALBION ELEVATOR CO. et al., Appellants,**

v.

**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Appellee.**

No. 58020.

Supreme Court of Iowa.

May 25, 1977.

Thoma, Schoenthal, Davis, Hockenberg & Wine, Des Moines, for appellants.

Gamble, Riepe, Burt, Webster & Fletcher, Des Moines, for appellee.

Heard before MOORE, C. J., and MASON, UHLENHOPP, HARRIS, and McCORMICK, JJ.

MASON, Justice.

On July 6, 1972, sixty grain dealers commenced an action in the Polk District Court against Chicago and North Western Transportation Company, a common carrier of grain, seeking to recover damages for grain lost between various points of departure and destination. Plaintiffs and defendant moved for summary judgment on one of the three theories of recovery asserted in the petition and the district court sustained defendant's motion. Plaintiffs appeal from that ruling and the judgment entered pursuant thereto.

In conjunction with their respective motions for summary judgment, the parties entered into a stipulation setting forth the relevant facts surrounding the controversy. It provides in pertinent part the following:

"* * * *

"7. At all times material hereto, defendant and its predecessor in interest [Chicago and North Western Railway Company] have had on file with the Interstate Commerce Commission in the District of Columbia the tariffs, rates and classifications required by the provisions of 49 U.S.C.A. § 6.

"* * * *

"9. The issues to be decided in the pending action at the present time are governed by the provisions of the Interstate Commerce Act, 49 U.S.C.A. §§ 1, et seq., particularly the provisions of 49 U.S.C.A. § 20(1) and the provisions of 49 U.S.C.A. §§ 2, 3(1) and 41.

"10. For the purpose of resolution of the issues to be decided in the pending action *at the present time*, plaintiffs and defendant stipulate and agree as follows with respect to each shipment at issue herein:

"* * * *

"b. Each shipment was tendered by one of plaintiffs to defendant for transportation

in interstate commerce with freight charges collect at destination.

"* * * *

"g. The destination weight for each shipment was less than the origin weight.

"h. Freight charges for each shipment were paid by the consignee thereof.

"i. Freight charges * * * were paid * * *, at the election of the consignee, on the basis of freight rates applicable to minimum weights rather than freight rates applicable to actual destination weights.

"j. Freight charges * * * are the same for both the minimum weight and all weights below the minimum weight.

"k. The consignee * * * charged the consignor * * * a minimum weight penalty computed by subtracting the gross destination weight from the minimum weight and multiplying the difference by the freight rate applicable to the minimum weight.

"l. Plaintiffs, by their agent, filed a timely claim in writing with defendant for each shipment.

"m. The claim for each shipment contained both a claim for the value of grain allegedly lost and a claim for a minimum weight penalty.

"* * * *

"q. The claim for the minimum weight penalty * * * was computed by subtracting the gross destination weight from either the origin weight or the minimum weight, whichever was less, and multiplying the difference by the freight rate applicable to the minimum weight.

"r. Defendant has paid, in whole or in part, the claim for the value of grain allegedly lost for each shipment.

"s. Defendant has timely declined in writing the claim for a minimum weight penalty for each shipment." (Emphasis in original).

The stipulation went on to set forth the factual situation surrounding one of plaintiffs' claims as representative of the group's claims. That example provided in part as follows:

"a. On March 16, 1972, plaintiff, L. H. Grain Company, as consignor, tendered to defendant's predecessor in interest * *, a carload of soybeans * * *.

"b. The contract for sale of the soybeans between L. H. Grain Company, as consignor, and Continental Grain Company, as consignee, provided that it was the duty of L. H. Grain Company, * * *, to deliver 120,000 pounds of soybeans to Continental * * *, and to assume any loss resulting from noncompliance.

"c. The origin weight * * * was 120,000 pounds.

"* * * *

"e. The destination weight * * * was 117,640 pounds.

"f. The minimum weight applicable to the shipment was 120,000 pounds. * * *

"g. The freight rate applicable to the minimum weight was $0.476625 per one hundred pounds. * * *

"h. The freight charges applicable under the minimum weight tariff were $571.95 (120,000 × $0.476625).

"i. The freight charges applicable under the minimum weight tariff were the same based on either a destination weight of 120,000 pounds or a destination weight of 117,640 pounds.

"* * * *

"k. The freight charges applicable under the actual destination weight tariff would have been $964.65. (117,640 × $0.82).

"l. Continental Grain Company, * *, elected to pay freight charges based on the minimum weight tariff applicable to 120,-000 pounds.

"m. Continental Grain Company, * *, charged and collected from L. H. Grain Company, * * *, a minimum weight penalty of $10.97 computed by deducting the gross destination weight of 117,640 pounds from the minimum weight of 120,-000 pounds and multiplying the difference (2,360 pounds) by the freight rate applicable to the minimum weight ($0.4650). (The consignee did not add the 2.5% surcharge * * * ).

"n. On May 11, 1972, L. H. Grain Company, * * *, by its agent, * * *, filed a timely claim in writing with defendant.

"o. The claim contained a claim for $120.99 for the value of the soybeans allegedly lost and a claim for $10.97 for a minimum weight penalty.

" * * * *

"r. On May 26, 1972, defendant timely declined in writing the claim for a minimum weight penalty.

"s. On June 9, 1972, defendant paid * * * [L. H. Grain's agent] $120.99."

The basic contentions of the parties were set forth in the stipulation as follows:

"12. For the purpose of resolution of the issues to be decided in the pending action at the present time, plaintiffs contend that the minimum weight penalty is a proper element of damages permitted under the provisions of 49 U.S.C.A. § 20(11). Defendant denies such contention.

"13. For the purpose of resolution of the issues * * *, defendant contends that the minimum weight penalty is a rebate of freight charges prohibited under the provisions of 49 U.S.C.A. §§ 2, 3(1) and 41. Plaintiffs deny such contention."

December 19, 1974, the district court granted defendant's motion for summary judgment and in so ruling concluded as follows:

"It is unlawful for a common carrier in interstate commerce to, directly or indirectly, by rebate or other device, collect or receive a less compensation for service rendered in transportation than it charges other persons for like service (49 U.S.C.A. sec. 2). In addition, the Elkins Act enjoins that a carrier strictly observe its tariffs, and makes it unlawful for any shipper or consignee to solicit or receive any rebate or other concession whereby property is transported at a less rate than that published in the carrier's tariffs (49 U.S.C.A. sec. 41).

"It will be seen from the foregoing that L. H. Grain Co. has been 'made whole' by defendant insofar as the actual disappearance of 2,360 pounds of soybeans is concerned. L. H. Grain Co.'s being charged a so-called 'minimum weight penalty' of $10.97 by Continental Grain Company is the result of a contractual arrangement whereby L. H. Grain Co. assumes a theoretical charge if Continental is not able to receive the maximum possible benefit, i. e., transportation of the maximum weight possible, from the minimum weight rate tariff provisions.

"If defendant would recognize and pay L. H. Grain Co.'s claims for the so-called 'minimum weight penalty' in the amount of $10.97, defendant would have transported 117,640 pounds of soybeans * * *, for a freight charge of $560.98, whereas the minimum lawful tariff charge for such transportation was $571.95. The Court is of the opinion that such would constitute a rebate and be unlawful."

January 17, 1975, the district court entered judgment for defendant, overruled plaintiffs' motion for summary judgment and dismissed the petition.

A summary of the pertinent stipulated facts gleaned from the statement of the case set forth in plaintiffs' brief may be helpful, particularly in view of the fact defendant makes no complaint of the statement.

The published tariff with respect to grain shipments which defendant must follow by law establishes certain freight rates applicable to minimum weights for the carriage of grain between two specific points. The minimum weight for soybeans as established by tariff is 120,000 pounds. The freight rate applicable to this minimum weight is .476625 per one hundred pounds and since the freight rate is based on the minimum weight rather than the actual destination weight, the railroad consistently collects a full charge of $571.95 (120,000 pounds $\times$ .476625 per one hundred pounds) regardless of the actual destination weight.

In the particular claim presented for illustration in the stipulated facts the consignor loaded 120,000 pounds but only 117,640 pounds were delivered by the carrier. Irrespective of this shortage the railroad collected the same freight charge ($571.95)

on 117,640 pounds of soybeans as it would have received on 120,000 pounds of soybeans if that amount had been delivered.

The contractual relationship between the grain elevators (consignors) and the grain buyers (consignees) provides the contract purchase price of the grain is determined on the price or value of the grain at the shipping point and not at the destination point. Freight charges are to be paid by the consignee, collected at destination. The contract also requires the consignors to load and deliver minimum weights. The consignors agreed to assume any loss resulting from failure to deliver minimum weights of grain.

The example set forth in the stipulated facts is used by plaintiffs to explain the term "minimum weight penalty." As stated, the consignor and consignee had entered into a contract for the sale and delivery of 120,000 pounds of soybeans which is the minimum weight prescribed by tariff and as such produces the lowest freight cost per pound to the consignee who is obligated to pay the freight charges. Since the freight charge is the same on 120,000 pounds as on 117,640 pounds or any weight below 120,000 pounds, the consignee minimizes its transportation costs by receiving shipments at or above minimum weights. In the example used the consignee paid $571.95 in freight charges to the railroad for 117,640 pounds of soybeans which is a transportation expense of .48618 per one hundred pounds. If the railroad had delivered the amount of grain called for in the contract and actually loaded by the consignor into the railroad car, that is, 120,000 pounds, then the transportation costs per one hundred pounds of delivered product would only be .476625. Thus, failure of the railroad to deliver the full 120,000 pounds results in the consignee having to bear a higher freight rate (approximately $.01 per one hundred pounds) than anticipated and desired.

The consignee in such a situation would normally have various options available to it in seeking to recoup this loss caused by the railroad's failure to deliver all the grain loaded. The consignee could refuse to pay a proportionate part of the freight charges, i. e., the minimum weight rate per hundred pounds (.476625) times the shortage (2,360 pounds). Otherwise, the consignee could elect to pay the full freight charge and then file a claim for reimbursement based on the same proportionate calculations. In either case, the amount of the claim would be the same. Finally, the consignee could pursue the method utilized in the instant case which is to enter into agreements with the consignors that the consignors will assume any loss suffered by the consignee where shipments at less than the full minimum weight are delivered by the railroad. The consignees thus pay the full freight charge and then simply deduct from the purchase price due the consignor of the delivered grain the proportionate "excess" freight charge per one hundred pounds incurred. The consignors thereby become assignees of whatever claim the consignee had against the railroad for freight charges. The consignor then presents claims to the railroad for both the contract price of the lost grain and the proportionate share of the freight charge paid on grain that was never delivered. This proportionate share of the freight charge claim is referred to as a "minimum weight penalty."

The tariff provides an alternative for payment of freight charges based on actual destination weight rather than minimum weight, but the freight rate applicable under this alternative is $0.82 per one hundred pounds.

The contract price of soybeans in the illustrated case was $3.285 per bushel, the price at the Iowa elevator. When the grain arrived at Beaumont, Texas, the consignee paid the consignor the contract price of grain actually delivered (1960.67 bushels × $3.285) less $10.97 as the minimum weight penalty.

The consignor filed a claim with defendant for both the loss of grain and the minimum weight penalty.

The railroad contends payment of the minimum weight penalty would constitute a rebate which the law prohibits. Plaintiffs contend otherwise.

Plaintiffs' contentions herein present the following question for this court's consideration: Would defendant's payment of plaintiffs' minimum weight penalty claims constitute a prohibited rebate of freight charges or would it simply be the payment of an appropriate element of recoverable damages?

■ I. The challenged ruling of the trial court was based upon the facts established by the previously mentioned stipulation filed herein. Accordingly, this court's scope of review is as follows:

"Where the facts are not in material dispute, interpretation placed thereon by trial court becomes a question of law which is not conclusive on appeal. * * * [citing authority]." *City of Spencer v. Hawkeye Security Insurance Co.*, 216 N.W.2d 406, 408 (Iowa 1974).

II. The petition in this law action comprises 60 separate divisions of three counts each, all similar in nature. In the aggregate, plaintiffs seek recovery of $25,000.00 as damages. Only three of the plaintiffs seek recovery of $1,000 or more.

Rule 333, Rules of Civil Procedure, provides:

"Except where the action involves an interest in real estate, no appeal shall be taken in any case where the amount in controversy, as shown by the pleadings, is less than one thousand dollars, unless the trial judge, within thirty days after the judgment or order is entered, certifies that the cause is one in which appeal should be allowed. The right of appeal is not affected by any remission of any part of the verdict or judgment."

No certification contemplated by rule 333 was filed herein.

■ In the absence of the requisite amount in controversy established by rule 333 this court is without jurisdiction to hear the appeal and it must consequently be dismissed. *Bridal Publications, Inc. v. Richardson*, 229 N.W.2d 771, 773–774 (Iowa 1975); *Benttine v. Jenkins Truck Lines, Inc.*, 182 N.W.2d 374, 376 (Iowa 1970).

In light of rule 333 a question arises as to the right of 57 of these plaintiffs to prosecute this appeal since no one of them can alone supply the requisite jurisdictional amount in controversy for an appeal under this rule.

■ No motion was made to dismiss any of these appeals. Nevertheless, this court can and should dismiss an appeal on its own motion when the lack of jurisdiction is apparent.

We must therefore decide if the amount in controversy exceeds the minimum required by the rule.

Resolution of that question involves consideration of two judicially evolved theories pertaining to amount in controversy requirements.

One tactic which would enable the 57 plaintiffs to maintain their appeals is founded upon the aggregation of the individual claims asserted. In the federal arena, the following statement from *Zahn v. International Paper Company*, 414 U.S. 291, 292–295, 94 S.Ct. 505, 507–509, 38 L.Ed.2d 511, conclusively disposes of an argument based upon the alleged validity of the aggregation of claims to satisfy an amount in controversy requirement:

"From the outset, Congress has provided that suits between citizens of different States are maintainable in the district courts only if the 'matter in controversy' exceeds the statutory minimum * * *. 28 U.S.C. § 1332(a). The same jurisdictional-amount requirement has applied when the general federal-question jurisdiction of the district courts, 28 U.S.C. § 1331(a), is sought to be invoked. A classic statement of the dichotomy that developed in construing and applying these sections is found in *Troy Bank of Troy, Indiana v. G. A. Whitehead & Co.*, 222 U.S. 39, 40–41, 32 S.Ct. 9, 56 L.Ed. 81 (1911):

" 'When two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount; but when several plaintiffs unite to enforce a

single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount.'

"This distinction and rule that multiple plaintiffs with separate and distinct claims must each satisfy the jurisdictional-amount requirement * * * were firmly rooted in prior cases dating from 1832, and have continued to be the accepted construction of the controlling statutes, now §§ 1331 and 1332. The rule has been applied to forbid aggregation of claims where none of the claimants satisfies the jurisdictional amount, as was the case in *Scott v. Frazier*, 253 U.S. 243, 244, 40 S.Ct. 503, 64 L.Ed. 883 (1920), for example, where the Court stated the rule to be that 'the amount in controversy must equal the jurisdictional sum as to each complainant.' * * * "

In *Snyder v. Harris*, 394 U.S. 332, 335, 89 S.Ct. 1053, 1056, 22 L.Ed.2d 319, reh. den., 394 U.S. 1025, 89 S.Ct. 1622, 23 L.Ed.2d 50, is the following language:

"The traditional judicial interpretation under all of these statutes has been from the beginning that the separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement. Aggregation has been permitted only (1) in cases in which a single plaintiff seeks to aggregate two or more of his own claims against a single defendant and (2) in cases in which two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest. * * *."

The following are a few of the many cases which have applied the principles set out above: *National Treasury Employees Union v. Nixon*, 160 U.S.App.D.C. 321, 492 F.2d 587, 592· *Deutsch v. Hewes Street Realty Corporation*, 359 F.2d 96, 98, n. 1 (2 Cir. 1966); *Alvarez v. Pan American Life Insurance Company*, 375 F.2d 992, 994 (5 Cir. 1967), 3 A.L.R.Fed. 363, cert. den., 389 U.S. 827, 88 S.Ct. 74, 19 L.Ed.2d 82; *Crenshaw v. Great Central Insurance Co.*, 482 F.2d 1255, 1259–1260 (8 Cir. 1973); *Handy v. General Motors Corporation*, 518 F.2d 786, 787 (9 Cir. 1975); *Hylte Bruks Aktiebo-*

*lag v. Babcock & Wilcox Company*, 305 F.Supp. 803, 807 (S.D.N.Y.1969); *Georgia Ass'n of Ind. Ins. Ag., Inc. v. Travelers Indem. Co.*, 313 F.Supp. 841, 843 (N.D.Ga. 1970); *United Pacific/Reliance Ins. Cos. v. City of Lewiston*, 372 F.Supp. 700, 701–702 (D.Idaho 1974).

In *Bridal Publications, Inc. v. Richardson*, 229 N.W.2d at 775–776, this court in dealing with the aggregation theory employed the following analysis:

"* * * [T]here are many federal cases holding the jurisdictional amount may not ·be achieved by such aggregation.

"The principle of those federal cases is stated in this fashion in *Georgia Ass'n of Ind. Ins. Ag., Inc. v. Travelers Indem. Co.*, 313 F.Supp. 841, 843:

" 'It is well settled, of course, that "when two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount." * * * [citing authorities].'

"*Crenshaw v. Great Central Insurance Co.*, 482 F.2d 1255, 1259–1260 (8 Cir. 1973), has this statement:

" ' "It is a familiar rule that when several plaintiffs assert separate and distinct demands in a single suit, the amount involved in each separate controversy must be of the requisite amount to be within the jurisdiction of the district court, and that those amounts cannot be added together to satisfy jurisdictional requirements." '

" 'The rule just stated forecloses the aggregation of the claims of the separate and distinct plaintiffs for the purpose of determining subject matter jurisdiction.'

"We recognize that the foregoing cases concern 'the amount in controversy' necessary for jurisdiction in federal courts. However, we see no basis why the reasoning in those opinions should not be relied on in reaching a determination in this case.

"We therefore conclude the correct rule should be that the *appellate jurisdiction of this court cannot be rested upon the aggre-*

*gate of several totally separate and distinct claims no one of which is itself alone of sufficient size to confer such jurisdiction. * * *."* (Emphasis supplied). See also *Kentucky Dept. Store v. Fidelity-Phenix Fire Ins. Co.,* 351 S.W.2d 508, 509 (Ky.1961); *Bolling v. Old Dominion Power Co.,* 181 Va. 368, 25 S.E.2d 266, 268.

■ A second arguably available basis for maintenance of the appeals herein is the concept of pendent jurisdiction. Utilizing said concept courts have exercised jurisdiction over claims of individuals who could not alone satisfy jurisdictional amount requirements. This expansion of jurisdiction is justified by the fact that the claim over which the court has no jurisdiction is closely related to a claim within the scope of the court's jurisdiction.

A number of federal courts, relying upon pendent jurisdiction have exercised jurisdiction over claims of less than $10,000 where those claims were joined with, closely related to and involved the same operative facts as claims for more than $10,000. See e.g., *Jacobson v. Atlantic City Hospital,* 392 F.2d 149, 153–155 (3 Cir. 1968); *Stone v. Stone,* 405 F.2d 94, 96–99 (4 Cir. 1968), cert. den., 409 U.S. 1000, 93 S.Ct. 315, 34 L.Ed.2d 261, reh. den., 409 U.S. 1118, 93 S.Ct. 896, 34 L.Ed.2d 703; *F. C. Stiles Contracting Co. v. Home Insurance Co.,* 431 F.2d 917, 919–920 (6 Cir. 1970); *Beautytuft, Inc. v. Factory Insurance Association,* 431 F.2d 1122, 1128 (6 Cir. 1970); *Hatridge v. Aetna Casualty & Surety Company,* 415 F.2d 809, 816–817 (8 Cir. 1969). However, at least one circuit has rejected the application of pendent jurisdiction in such circumstances as an impermissible expansion of federal jurisdiction. In *Hymer v. Chai,* 407 F.2d 136, 137 (9 Cir. 1969), the court makes the following comments:

"Mrs. Chai's claim of $7500 damages for loss of consortium fell below the monetary minimum necessary to sustain federal diversity jurisdiction * * *, and no independent basis for federal jurisdiction existed. The District Court had no jurisdiction * * * unless her claim can be tacked to

her husband's action by the doctrinal thread known as 'pendent jurisdiction.'

"The doctrine of pendent jurisdiction permits a federal court to accept jurisdiction of a party's nonfederal claims which are intertwined with his federal claims in a case in which all of the claims emerge from 'a common nucleus of operative fact.' (*United Mine Workers v. Gibbs* (1966) 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218.) Pendent jurisdiction was devised to avoid the waste and inefficiency resulting from fragmenting a single action and dividing the pieces into separate proceedings before the state and federal courts and to encourage a party who had a claim presenting a substantial federal question, mixed with a nonfederal claim, to take his bundle of claims to the federal court.

"Joinder of claims, not joinder of parties, is the object of the doctrine. It was not designed to permit a party without a federally cognizable claim to invoke federal jurisdiction by joining a different party plaintiff asserting an independent federal claim growing out of the same operative facts. * * *."

The Supreme Court's opinion in *Zahn,* supra, seriously undermines the foundation upon which are based those opinions cited above which approve of the pendent party jurisdictional theory. In *Zahn,* following the previously quoted statement of the general rule, the Court said:

"* * * It also requires dismissal of those litigants whose claims do not satisfy the jurisdictional amount, even though other litigants assert claims sufficient to invoke the jurisdiction of the federal court. * * * [citing authorities].

"In *Clark v. Paul Gray, Inc.,* [306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001] decided after the effective date of the Federal Rules of Civil Procedure in 1938, the Court applied the familiar rule that 'when several plaintiffs assert separate and distinct demands in a single suit, the amount involved in each separate controversy must be of the requisite amount * * *.' 306 U.S., at 589, 59 S.Ct., at 748. Upon ascertaining on its own motion that only one of the plain-

tiffs in the District Court had presented a claim satisfying the jurisdictional amount, the court reached the merits of that claim but directed the District Court to dismiss the claims of all other plaintiffs for want of jurisdiction." 414 U.S. at 295–296, 94 S.Ct. at 509, 38 L.Ed.2d at 511.

A number of courts have read *Zahn* as extinguishing the concept of pendent party jurisdiction. In *Osbahr v. H & M Const., Inc.,* 407 F.Supp. 621, 622–623 (N.D.Iowa, W.D.1975), is the following:

"* * * [A] number and perhaps a majority of the federal circuits have extended the doctrine of pendent jurisdiction to encompass the joinder not only of claims but of additional parties, thus creating the category of 'pendent parties.' * * * [citing authorities]. With specific relevance to this case, pendent jurisdiction has been exerted over a claim against a party for less than $10,000 if diversity exists and a claim against another diverse party exceeds $10,-000. * * * [citing authorities].

"The continuing validity of the reasoning in these latter cases has been undermined by the Supreme Court's decision in Zahn * * *, which held that multiple plaintiffs in a class action must each satisfy the jurisdictional amount requirement. * * * As the dissent in that case indicates, ancillary or pendent jurisdiction over the claims for less than $10,000 was argued to but not accepted by the majority. * * * This court is inclined to agree with the view that pendent jurisdiction may no longer be extended over additional parties against whom a separate claim falls short of the requisite jurisdictional amount. * * * [citing authorities]." See also *Freeman v. Gordon & Breach, Science Publishers, Inc.,* 398 F.Supp. 519, 524–526 (S.D.N.Y.1975); *United Pacific/Reliance Ins. Cos. v. City of Lewiston, supra,* 372 F.Supp. at 702–705. But see *Afton Alps, Inc. v. United States,* 392 F.Supp. 543, 546, n. 2 (D.Minn.1974).

1 Moore's Federal Practice, section 0.97[3], expresses the following view of the problem:

"Where two or more plaintiffs join in the same action to prosecute their individual claims against a single defendant, and the claims are separate and distinct, each claim must rest on an independent jurisdictional basis and the values of these several rights may not be aggregated in determining the amount in controversy. Plaintiffs' claims may not be aggregated merely because the plaintiffs have a community of interest or because their claims are derived from a single instrument.

"Nor does the fact that their claims arise from the same occurrence or set of operative facts permit aggregation. Some courts have circumvented this rule of aggregation by extending the principle of pendent jurisdiction, traditionally applied only in federal question cases, to diversity cases thereby allowing a claim for less than the jurisdictional amount arising out of the same operative facts to 'ride on the coattails' of a claim meeting the jurisdictional requisite. In light of the Supreme Court's reaffirmation in *Snyder v. Harris* of the traditional rule that separate and distinct claims must individually meet the amount requirement, this application of pendent jurisdiction seems unacceptable, and some cases have so held.

"Where, however, the several plaintiffs unite to enforce an 'integrated' or 'undivided' right, it is the value of the entire right which is in controversy and this total value is used, when pertinent, in determining whether or not federal jurisdiction exists.

"The classic statement of the rule is contained in *Pinel v. Pinel* [240 U.S. 594, 596, 36 S.Ct. 416, 60 L.Ed. 817, 818] where the Court, speaking through Justice Pitney, said:

" 'The settled rule is that when two or more plaintiffs having separate and distinct demands unite in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount; but when several plaintiffs unite to enforce a single title or right in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount.' " See also 1 Cyc. of Fed.Proc., (Third Ed.), section 2.220.

The authors of 14 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction section 3704, analyze the problem and criticize the solution of it suggested by some federal courts.

■ It is clear under rule 333, R.C.P., the claims of 57 of these plaintiffs standing alone cannot be maintained on appeal because of the lack of the requisite jurisdictional amount in controversy. The question here is whether the appellate jurisdiction of this court may be exercised over those claims when joined with a claim being prosecuted on appeal where the requisite amount in controversy exists.

This question is not precisely the same as the question raised in *Bridal Publications, Inc. v. Richardson*, Iowa, 229 N.W.2d 771.

We again recognize, as we did in *Bridal Publications*, that the cases which we rely on in reaching our determination of this question concern "the amount in controversy" necessary for jurisdiction in federal courts. 229 N.W.2d at 776.

In our opinion the reasons relied on for recognition of the doctrine of pendent jurisdiction in the federal courts, *Hymer v. Chai*, 407 F.2d at 137, do not exist here where only appellate jurisdiction is involved. In addition, it is at least seriously doubtful whether the pendent party jurisdictional doctrine remains a viable theory following the Court's pronouncements in *Zahn*.

Plaintiffs here assert claims arising from identical factual circumstances, but the claim of each plaintiff clearly arose from separate and distinct occurrences. Where, as here, the claims of the respective plaintiffs are several and distinct, we conclude each must establish the requisite amount for his appeal to be within the appellate jurisdiction of this court.

The foregoing conclusion requires the appeals of those plaintiffs who did not seek damages of $1,000 or more be dismissed. Consequently, only the claims of Brandt Elevator, Inc., L. H. Grain Co., and Johnson Grain & Milling Co. will be dealt with herein.

■ It should be noted that although the summary judgment motion granted herein only pertained to one of the three theories of recovery asserted in the petition, the ruling thereon resulted in a judgment for defendant on all counts. The trial court evidently concluded that its ruling on the motion precluded relief under any theory of recovery. Therefore, this appeal is not subject to dismissal on the ground the adjudication below did not dispose of the entire matter. See *Swets Motor Sales, Inc. v. Pruisner*, 236 N.W.2d 299, 302 (Iowa 1975); *Flynn v. Lucas County Memorial Hospital*, 203 N.W.2d 613, 614–615 (Iowa 1973).

III. As noted, plaintiffs maintain the minimum weight penalty is an appropriate element to be considered in fixing damages sustained by reason of the loss of a portion of the soybeans shipped. Plaintiffs rely upon 49 U.S.C.A. section 20(11), which provides in part as follows:

"Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation * * * shall be liable * * * for any loss, damage, or injury to such property caused by it * * *."

Defendant, on the other hand, maintains payment of the minimum weight penalty would constitute a rebate prohibited by 49 U.S.C.A. sections 2, 3(1) and 41(1), which provide in part as follows:

"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service * * *, than it charges, demands, collects, or receives from any other person or persons for doing * * * a like and contemporaneous service * * * under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful." 49 U.S.C.A. section 2.

"It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue

or unreasonable preference or advantage to any particular person, company, * * *, in any respect whatsoever; or to subject any particular person, company, * * * to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; * * *." 49 U.S.C.A. section 3(1).

" * * * The willful failure upon the part of any carrier subject to [said Acts] to file and publish the tariffs or rates and charges as required by said [Acts], or strictly to observe such tariffs until changed according to law, shall be a misdemeanor, * * *; and it shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said [Act] * * * whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, * *, or whereby any other advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give or solicit, accept, or receive any such rebates, concessions, or discrimination shall be deemed guilty of a misdemeanor, *. *." 49 U.S.C.A. section 41(1).

In view of the provisions of 49 U.S.C.A. section 20(11) the question is whether the freight charges attributable to the lost soybeans are submissible items of damages under the circumstances shown by the record.

If the minimum weight penalty is a proper item of common law damages as maintained by plaintiffs, it is their contention payment of such item by the carrier would not constitute a rebate which is prohibited by 49 U.S.C.A. sections 2, 3(1) and 41(1), set out earlier.

At this point, this court must decide whether 49 U.S.C.A. section 20(11) changes the common law measure of damages.

In *Chicago, M. & St. P. R. Co. v. McCaull-Dinsmore Co.*, 253 U.S. 97, 40 S.Ct. 504, 64 L.Ed. 801, the Court was faced with a situation where the carrier, relying upon the terms of the bill of lading, was seeking to limit its liability to an amount less than that prescribed by the common law measure of damages. The following language from that opinion demonstrates the Court's belief the common law measure of damages was incorporated by the provisions of the Interstate Commerce Act:

" * * * The rule of the common law is not an arbitrary fiat, but an embodiment of the plain fact that the actual loss caused by breach of a contract is the loss of what the contractee would have had if the contract had been performed, *less the proper deductions* [freight charges], which have been made and are not in question here. It seems to us, therefore, that the decision below was right, and as, in our opinion, the conclusion is required by the statute, neither the convenience of the clause, nor any argument based upon the history of the statute or upon the policy of the later Act * * *, can prevail against what we understand to be the meaning of the words. * * *." 253 U.S. at 100, 40 S.Ct. at 504, 64 L.Ed. at 803. (Emphasis supplied).

In *Thompson v. H. Rouw Co.*, 237 S.W.2d 662, 665 (Tex.Civ.App.1951), the court surveyed the legislative and judicial history of 49 U.S.C.A. section 20(11) and concluded as follows:

" * * * The history of these enactments, decisions, and promulgations demonstrates that it is now settled that *nothing more nor less may be recovered than allowed under the common law. * * *.*" (Emphasis supplied).

The following authorities lend support to the proposition that the common law measure of damages was codified by 49 U.S.C.A. section 20(11): *Missouri Pacific R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194; *W. A. Stackpole Motor Transp. v. Malden Spin. & Dye. Co.*, 263 F.2d 47, 51 (1 Cir. 1958); *Aaacon Auto Transport v. State Farm Mut. Auto. Ins.*, 537 F.2d 648, 654–655 (2 Cir. 1976); *Chandler v. Aero Mayflower Transit Company*, 374 F.2d 129, 132, n. 2 (4 Cir. 1967); *Great Atlantic & Pacific Tea Co. v. Atchison, T. &*

*S. F. Ry. Co.*, 333 F.2d 705, 707–708 (7 Cir. 1964), cert. den., 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560; *Yellow Freight System, Inc. v. United States*, 413 F.Supp. 357, 371 (W.D.Mo., W.D., 1975); *Sutherland v. Ringsby Truck Lines, Inc.*, 549 P.2d 784, 785 (Colo.App.1976); *Mont. Ward & Co. v. Peter J. McBreen & Assoc.*, 40 Ill.App.3d 69, 351 N.E.2d 324, 326; *Forest Green Farmers' Elevator Co. v. Davis*, 216 Mo.App. 545, 270 S.W. 394, 397–398.

In the present case the carrier paid plaintiffs the value of the lost soybeans at the time and place of shipment—$3.285 per bushel. This was the contract price fixed by plaintiffs and the consignees. There is no controversy as to this amount or as to the payment thereof by the carrier. The fight is over plaintiffs' claim for a proportionate share of the paid freight charges.

■ In determining the "full actual loss" under section 49 U.S.C.A. 20(11) it is our opinion the shipper of lost goods is entitled to compensatory damages which will place the shipper in the same position as it would have been if the contract of carriage had been performed without breach.

■ In certain circumstances, the party shipping goods may recover freight charges as an element of damages arising from transportational loss. In *Pennsylvania R. Co. v. Olivit Bros.*, 243 U.S. 574, 585–586, 37 S.Ct. 468, 472, 61 L.Ed. 908, 913–914, are the following comments:

"The fourth contention is that plaintiff should not recover as part of its damages the freight paid upon delivery at destination.

"The contention is rested upon the prohibition of the Interstate Commerce Act against deviation from the filed tariffs and schedules and against rebates and undue preferences and discriminations. It is not asserted in the present case that there was an evasion of the statute or an attempt to evade, but that the possibility of such result makes the recovery of freight illegal. * * [T]o the contentions the plaintiff opposes the terms of the bills of lading, they providing that the amount of loss or damage for which a carrier is liable 'shall be computed on the basis of the value of the property (being the bona fide invoice price, if any, to the consignee, including the freight charges, if paid) at the place and time of shipment. . . .'

"Some of the bills of lading do not contain this provision, but it was agreed at the trial that the proper measure of damages was to be computed upon the basis of the value of the property at the place and time of shipment and that such measure should be read into all of the bills of lading. As plaintiff further says, to recover the damages sustained by it, based upon this value, plaintiff must receive from defendant the difference between this value and the proceeds of the sale, and the freight paid. In this we concur, and therefore there was no error in including in the recovery such freight. * * * [citing authorities]. The plaintiff was no more than made whole."

In the annotation at 83 L.Ed. 867, 877–879, it is said:

"As to whether the carrier or the consignor must stand the freight charges in case of a loss of or damage to the goods, the rule apparently is that, under bills of lading providing that loss or damage shall be computed at the value or cost of the goods or property at the time and place of shipment, the carrier is not entitled to have the amount of the freight deducted from the value as ascertained under the contract, or, in other words, that the freight, if paid, should be added to the value at the time and place of shipment.

" * * * [citing authorities].

" * * *

"In the ordinary damage rule, which measures the recovery by the difference between the market value for sound goods at destination on the date when the goods should have arrived and the actual amount received on sale of the damaged goods, no allowance is made whereby the shipper can recover his freight expense. * * *."

The statements quoted from *Olivit Bros.* and the annotation in 83 L.Ed. refer to provisions of the bill of lading as designat-

ing the place of computing damages. Attached to the stipulation of facts in this matter and incorporated by reference were exhibits 1 through 7. Exhibit 1 is described as "bill of lading." This exhibit is a photostat of the face of the memorandum copy of the bill of lading and does not have any conditions or provisions printed on the reverse side thereof. We are not made aware of the provisions of the bill of lading at any other point in the record. Nevertheless, the carrier paid the value of the soybeans at the point of shipment.

Plaintiffs concede rebates are prohibited by law but insist a shipper receives no rebate when a measure of damages which does no more than place the shipper in the same position as it would have been if the contract of carriage had been performed without breach is employed.

In our opinion the purpose and intent of 49 U.S.C.A. section 20(11) is to provide full compensation to those who have been damaged by the railroad's failure to complete successfully the carriage of goods. It does not change the common law measure of damages.

We conclude where a shipper, as here, receives only the point of shipment value of the lost commodity rather than its destination value, a measure of damages which permits him to recover freight charges paid on the lost portion of the shipment as compensation for his "full actual loss" is proper. In our opinion such a measure of damages does not subject the carrier to the payment of a rebate prohibited by 49 U.S.C.A. sections 2, 3(1) and 41(1).

The trial court erred in holding otherwise.

The appeals of 57 of the plaintiffs who did not seek damages of $1,000 or more are dismissed.

The costs in this court shall be taxed 50 percent to the appellee and 50 percent to the 57 appellants whose appeals have been dismissed.

The case is—

Reversed and remanded as to plaintiffs Brandt Elevator, Inc., L. H. Grain Co., and Johnson Grain & Milling Co.