ENSCO, INC., Plaintiff-Appellant and Cross-Appellee,

v.

WEICKER TRANSFER AND STORAGE CO., Defendant-Appellee and Third-Party Plaintiff,

v.

Warren JAYCOX, Defendant-Appellee,

v.

UNION PACIFIC RAILROAD COMPANY, Third Party Defendant Appellee-Cross-Appellant.

Nos. 80–1889, 80–1940.

United States Court of Appeals, Tenth Circuit.

Sept. 22, 1982.

Teryl R. Gorrell, Head, Moye, Carver & Ray, Denver, Colo. (Pamela A. Ray, Head, Moye, Carver & Ray, Denver, Colo., with him on the brief) for plaintiff-appellant cross-appellee Ensco, Inc.

William K. Ris, Wood, Ris & Hames, Denver, Colo., for defendant-appellee and third party plaintiff Weicker Transfer and Storage Co., and defendant-appellee Warren Jaycox.

John J. Mullins, Jr. and Edward Imatani, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for third party defendant-appellee-cross-appellant.

Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

## I. PRELIMINARY DISCUSSION

This is a transportation of equipment case. The determinative issue is whether under the facts and applicable law Weicker Transfer and Storage Co. was in the special circumstances presented acting as a common carrier, *or* as a contract carrier or lessor of equipment and servant.

The trial court found that Weicker had leased its equipment and driver to the appellant Ensco.

This appeal is from a judgment which was the result of a truck-train accident. The trial court held that none of the defendants were liable to Ensco for damages suffered. The appeal is from that denial, and from the further judgment of the court which awarded damages to Weicker on its counterclaims for repairs to its truck and shipping charges.

In 1976 Ensco contracted with the Federal Railroad Administration (FRA) to conduct tests of railroad track geometry on a section of Union Pacific track near Barstow, California. A highly sophisticated instrument known as the Track Survey Device was to be used for the tests. It is referred to as the TSD. It was built for FRA at a cost of a million dollars by General Applied Science Laboratories. It is a machine which incorporates a computer and a laser reference system. It has two self-propelled rail vehicles that function jointly in measuring track geometry. It weighs more than thirteen tons and has to be transported by truck from one test site to another. A crane lifts the TSD vehicles on and off the tracks as it is necessary.

Just prior to the present transaction, the TSD was stored at the Department of Transportation Test Center near Pueblo, Colorado. It was necessary, therefore, to transport it to California where the test site

was located. Weicker was employed to do this work because it had previously handled the equipment (the TSD) for Ensco during other track tests in Colorado. Weicker had provided a truck and also crane service for two tests which took place in 1976, and crane service for a test which took place in 1973.

Weicker was not authorized by the I.C.C. to operate as an interstate motor common carrier. It is authorized to transport commodities needing specialized handling or rigging because of size or weight between points in Colorado. It also had interstate contract carrier authority, limited to hauling fertilizer for a Wyoming company. Additionally, Weicker acted as the agent of Allied Van Lines in hauling household furniture, and it had intrastate common and contract carrier operating authority from the Colorado Public Utilities Commission (PUC). This is the sum total of Weicker's authority, and it is plain that it did not cover the instant activity.

Weicker was hired by Ensco to haul the TSD to Las Vegas, Nevada first. It was then to transport the TSD equipment to various test sites, within a 100-mile radius of Las Vegas. Weicker was also requested to provide crane service. Although it agreed to transport the TSD, it suggested that Ensco hire a crane service in Las Vegas. Ensco hired Jake's Crane and Rigging, Inc., of Las Vegas, to move the TSD on and off the tracks at the test sites.

Because Weicker did not have any interstate operating authority, the dispatcher had decided to purchase such authority for the trip. He contacted a broker in Pueblo, who sold to Weicker for $100 a "Freeport Lease" which ostensibly authorized Weicker to make the haul under the operating authority of Freeport Transport, Inc. Weicker was given a Freeport sign, which was attached to the cab. This served to give only an appearance of legality; the truth was that the purchased authority only authorized contract carriage of railway equipment for A & K Railroad M. Materials, Inc., a company which was not connected in any way with Ensco.

The driver of the Weicker transport was one Warren Jaycox but Ensco personnel supervised the loading of the TSD onto Weicker's trailer at the test center in Pueblo. Jaycox then drove the truck from Weicker's terminal in Pueblo to Jake's Crane and Rigging, Inc., in Las Vegas, where it arrived on January 5, 1977. He learned that the tests had been postponed and was told that he should fly home to Pueblo at Ensco's expense. He left the truck and the TSD at Jake's Crane and Rigging, Inc. and flew back to Las Vegas about two weeks later. There he met on January 18th with the Ensco personnel who were to conduct the testing. He was given directions to the test site by a Union Pacific representative. Jaycox and the Ensco personnel returned to Jake's to examine the truck and also the TSD. On January 19, Jaycox ascertained from Ensco personnel the best route to the site of the work. He had to travel on several dirt roads adjacent to the Union Pacific tracks in order to reach the site in question. The initial test was to have taken place that night. Jaycox left for the test site alone early that afternoon to ensure that he would be there before dark. He drove west on interstate highway into California, and then followed the dirt roads south toward the site. At dusk he arrived at a point where the road crossed two sets of railroad tracks. He drove slowly over the tracks, but became high centered. His efforts to free the truck were unsuccessful. Approximately thirty minutes later the truck was hit by a west bound Union Pacific train. This severely damaged the TSD and the tractor-trailer, and resulted in the test being aborted. The TSD was eventually transported to Colorado Springs for repairs. Ensco performed the repairs itself, eventually billing the FRA for $82,762.64.

Thereupon, suit was filed by Ensco against Weicker and Jaycox acting on behalf of FRA pursuant to FRA's request. It was alleged that Weicker was liable as a common carrier for direct and consequential damages resulting from the collision, or, in the alternative, that Jaycox and Weicker

were liable under a negligence theory. Essentially the suit on behalf of Ensco is under the so-called Carmack Amendment. Weicker counterclaimed against Ensco for damages to its tractor-trailer and for shipping charges. Jaycox and Weicker also impleaded United Pacific, asserting property damage and indemnification claims. Union Pacific filed claims against Ensco for indemnification and against Weicker, Jaycox and Ensco for damage to its locomotive.

## II. THE DECISION OF THE TRIAL COURT

Following a trial to the court judgment was entered against Ensco on all of its claims, and in favor of Weicker on its claims for damage to the truck and for shipping fees. In explaining its judgment the court stated that the agreement between Ensco and Weicker was most appropriately characterized as a contract to rent a tractor-trailer and driver rather than as common' or contract carriage. The court conceded that the operation itself might have been regarded as common carriage prior to arrival in Las Vegas, but thereafter, the court stated that "from that point forward * * * there was no doubt * * * that Ensco was exercising such a degree of control, authority and direction as to make this clearly a rental of a tractor-trailer and driver rather than a contract for drayage by common carrier." In support of its finding, the court said that Jaycox had been acting as a borrowed servant of Ensco at the time of the collision. A further finding of the court was that neither Jaycox nor any of the other defendants had been negligent in any respect with regard to the accident; that the collision was caused not by negligence on anyone's part, but by the unforeseeable occurrence of the tractor's wheels sinking into the soft ballast between the two sets of tracks at the crossing. Moreover, the court found that Ensco had failed to prove that it had mitigated its damages, or that its damages were reasonable. The FRA had ordered Ensco to repair the TSD itself without any investigation of whether other parties, such as the original builder, could do the job more reasonably

and cheaply. Repairs had been performed on a cost-plus basis, with substantial allotments for overhead and profit. The court also concluded that Weicker had produced adequate proof of the damage to its tractor-trailer and as to the rental fee due and owing, and that Ensco was liable for both amounts.

## III. DISCUSSION OF ISSUES

The contested issues on appeal are: the validity of the trial court's refusal to award Ensco damages for repairing the TSD, and also the validity of the award of truck rental fees to Weicker. There was previously an issue as to liability of Ensco to Weicker for the repair of its tractor-trailer which was resolved in favor of Weicker, but since the entry of judgment, Weicker has confessed error with regard to that part of the judgment in its favor. We have examined the facts and are in agreement with the position that was thus taken by Weicker. Union Pacific has appealed also, stating that it was dissatisfied with the trial court's judgment, but urging this court to reconsider its indemnification claims which were rejected by the district court. This would be necessary only if this court modified the judgment so as to subject Union Pacific to liability. No one has appealed the trial court's finding that negligence was not a factor in the collision, and for that reason, the appeal on behalf of Union Pacific is moot.

Inasmuch as Ensco's claim for the expenses incurred in repairing the TSD is sustainable only if Weicker had been acting as a common carrier in transporting the TSD, it is necessary to focus on the nature of the transportation arrangement; this will determine most of the case.

It is the contention of Ensco that Weicker was acting as a common carrier in transporting the TSD to the test site. The legal result, if it were sustainable, would be that Weicker would be liable for damage to the transported cargo even in the absence of any proven negligence. This is because of

the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 20(11) (1976).[1]

The above section provides in essence that a common carrier is subject to the provisions of the chapter if it receives property for transportation from a point in one state to a point in another state and it must issue a receipt or bill of lading therefore. Such a carrier is liable to the holder thereof for any loss, damage or injury to such property caused by it, whether such receipt or bill of lading has been issued or not, for the full actual loss or damage to such property caused by it.

■ A common carrier is not an absolute insurer, but is liable if the shipper establishes a prima facie case of carrier liability and the carrier does not meet its burden to show that it was free from negligence and that the loss was due to one of the causes excepted by the common law rule.[2] *Missouri Pacific R. Co. v. Elmore & Stahl,* 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964). In the *Missouri Pacific* case a carload of melons spoiled en route and the court said that the carrier had the obligation to inform itself of the condition of the goods at the time it receives them from the shipper, and that it is not to be doubted that while the carrier has possession, he is the only one in a position to acquire the knowledge as to actual damage to the shipment entrusted to its care. *L.E. Whitlock Truck Service v. Regal Drilling Co.,* 333 F.2d 488, 491 (10th Cir. 1964). The *Whitlock* case was similar in nature to *Missouri Pacific,* and the court held that the burden was on the carrier to prove that the shipment was not delivered to it in good order; that it was delivered by it in good condition, or that excepted causes were applicable and it was free of negligence.

■ If this were a situation in which Weicker is to be treated as a common carrier then, indeed, Ensco would have some

basis for its claim. The TSD was delivered to Weicker in good condition, and was released by Weicker to Ensco in a seriously damaged condition. Though the court found no negligence on Weicker's part—indeed, it found that Weicker was free from negligence—Weicker did not show that any of the excepted causes were applicable. But we are unable to conclude that Weicker was acting as a common carrier.

The Interstate Commerce Act defines a common carrier as:

> [A]ny person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes * * * (with exceptions not relevant here).

49 U.S.C. § 303(a)(14) (1976). A carrier's status as a common carrier is determined not by reference to its authority but rather by reference to what it holds itself out to be. *Starrett v. Bruce,* 391 F.2d 320, 323 (10th Cir. 1968); *Brennan v. Schwerman Trucking Co.,* 540 F.2d 1200, 1204 (4th Cir. 1976); *Smitherman & McDonald, Inc. v. Mansfield Hardwood Lumber Co.,* 6 F.2d 29, 32 (W.D. Ark. 1925). We are told that carriers sometimes seek to remove the appearance of common carrier by working out a lease of some kind; *United States v. Drum,* 368 U.S. 370, 395 n. 15, 82 S.Ct. 408, 421 n. 15, 7 L.Ed.2d 360 (1962) (dissenting opinion). As a result of this the Interstate Commerce Commission and the courts have tended to rule in the licensing context that arrangements involving a "lease" of a truck and driver are presumptively carriage for hire, that is, common or contract carriage. *Id.* at 381–82 and n. 25, 82 S.Ct. at 413–12 and n. 25; *United States v. Casale Car Leasing, Inc.,* 385 F.2d 707, 711 (2nd Cir.

---

1. All references to the I.C.C. provision refer to the Act which was in force in 1977, the time of the collision. The Act as it was revised in 1978 does not come into play here.

2. At common law a common carrier was not liable for loss or injury occasioned by acts of

God or of a public enemy, or for losses arising from the inherent nature of the goods transported or resulting from the fault of the shipper. *L.E. Whitlock Truck Service, Inc. v. Regal Drilling Co.,* 333 F.2d 488, 491 (10th Cir. 1964).

1967). Such a presumption is less relevant in a liability context; because there regulatory policies are less applicable.

Certainly the facts of the case before us convince us that the trial court correctly found that Weicker did not act as a common carrier in transporting the TSD for Ensco. The trial court's characterization of the arrangement as a lease need not be wholly endorsed since the stature of contract carrier has the same legal effect here as would a lease and borrowed servant. Perhaps the present facts satisfy the standards of both contract carriage and lease. The facts clearly show that Weicker was not a common carrier for the following reasons.

Both Weicker and Ensco apparently concede that Weicker's haul of the TSD to California was illegal whether the haul is characterized as common carriage, contract carriage or as a lease to a private carrier. As to common carriage, Weicker's ICC authority to operate as a common carrier extended only to transportation between points in Colorado as noted above. Similarly, its PUC common carrier authority was restricted to Colorado. As to being a contract carrier, Weicker's ICC contract carriage authority was limited to hauling fertilizer for a Wyoming company, and its PUC authority was limited to Colorado. The supposed "Freeport" authority that Weicker purchased was also worthless, because it was restricted to hauls for a Utah railway materials company. With regard to a lease to a private carrier, at the time of the collision, the ICC prohibited common carriers from renting out equipment and drivers, absent certain exceptions that are not applicable here. 49 C.F.R. Sec. 1057.6 (1978). As we view this, the illegality of the haul does not render impossible the finding that the haul was common carriage. The mission before us is determination of the transportation characterization issue in examining the expectations of the parties and in considering the indicia of common carriage that may or may not have attended the performance of the haul.

The business aspects of the haul itself bore little resemblance to common carriage. Weicker charged Ensco an hourly rate for tractor-trailer and driver. In addition, Ensco was apparently charged a "down time" fee for the tractor-trailer while it was parked on Jake's lot in Las Vegas between January 5 and January 18, 1977. Such billing practices contrast with common carriage where billing must conform to published tariffs based on weight and distance. Likewise, the purchase order that Ensco sent Weicker to cover the haul resembled a rental agreement rather than a bill of lading reflecting carriage for hire. The purchase order referred to "rental of a truck and driver", though the Ensco employee who drafted it testified that he was unaware of the difference between rental and carriage for hire. The bill that Weicker issued in response to Ensco's purchase order referred to the job ambiguously as "Haul Rail Testing Machine", but such a description is as consistent with rental of a truck and driver or with contract carriage, as with common carriage.

In addition, Ensco assumed some of the customary burdens of the transportation business that arose from the TSD haul. This also contrasts with the typical common carriage arrangement. It was said by the Supreme Court in *United States v. Drum, supra,* that transportation conducted by shipper is either common or contract carriage subject to regulation *unless* shipper assumes in significant measure the characteristic burdens of the transportation business. Weicker was responsible for choosing the driver for the trip and for advancing routine expenses such as oil and gasoline and insurance on the tractor-trailer. However, Ensco absorbed the cost of the driver subsistence, air travel to and from Las Vegas, and the state permits that were needed to travel through Arizona and Nevada. The driver's salary was included in the hourly rate that Ensco was to pay Weicker.

Perhaps the most persuasive argument for the proposition that this was either contract carriage or a truck lease arrangement is the way that the transportation service was carried on, particularly after the arriv-

al in California. The service that Ensco sought emphasized flexibility and specialized handling. Weicker did not merely transport freight from point of origin to destination by its own methods. Instead, it provided a whole series of services geared to the needs of Ensco and to the special characteristics of the TSD. The 1976 hauls of the TSD in Colorado had required Weicker to transport the TSD from test site to test site, to provide crane service to lift the TSD vehicles on and off the railroad tracks as necessary, and to support the entire operation in the field so that testing could take place wherever and whenever Ensco desired. One of the 1976 hauls required Weicker employees to spend about two weeks on the job with Ensco personnel, moving the TSD as required. These hauls are best characterized as contract carriage rather than common carriage. See *United States v. Contract Steel Carriers, Inc.,* 350 U.S. 409, 411, 76 S.Ct. 461, 462, 100 L.Ed. 482 (1956); ("services of a contract carrier must be individual and specialized").

*Santa Fe, P & P Ry. Co. v. Grant Bros. Constr. Co.,* 228 U.S. 177, 185, 33 S.Ct. 474, 477, 57 L.Ed. 787 (1913) recognized that the railroad authorized to act as a common carrier was not liable as such when acting outside the performance of its duty as a common carrier; "there may be special engagements which are not embraced within its duty as a common carrier, although their performance may incidentally involve the actual transportation of persons and things whose carriage in other circumstances might be within its public obligation." It would appear that the important element in distinguishing contract carriers from common carriers is the factor that the contract carriers render specialized service. Indeed, Weicker representatives have testified that the earlier hauls of the TSD were undertaken pursuant to its Colorado PUC contract carrier authority, though there was some confusion as to whether Weicker's ICC common carrier authority might not also have covered the hauls.

The obligations of Weicker with respect to the earlier hauls in 1973 and 1976 were not different from the obligations which existed in connection with the haul in the case at bar. The California job would take Weicker's tractor-trailer and driver off the public highways at all hours of the day and night, moving the TSD from test site to test site as necessary. Indeed, the record shows that Weicker did not even know in advance the location of the test sites to which its tractor-trailer and driver would be traveling. Weicker's dispatcher was told only that the sites were within 100 miles of Las Vegas. He observed that such an arrangement is not uncommon in contract carriage.

Finally, we return briefly to the California trip. Here once again Weicker was to be paid on an hourly basis for truck and driver, as had been the case with the Colorado hauls. The only difference between the California trip and the earlier hauls was that Weicker did not provide crane service for the California trip, a factor which we do not regard to be an important element. Besides it resulted not because Ensco expected Weicker to provide a different service, but rather because it would be cheaper to rent a crane in Las Vegas. Ensco seemed to view Weicker's obligations on the California trip as identical to the special services it had provided during the earlier Colorado tests. Based on the foregoing we conclude that the trial court was correct in finding the facts. These facts clearly establish that Weicker did not act as a common carrier in transporting the TSD to the test site in California.

The relevant case law also supports this disposition. *See Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 108–110, 62 S.Ct. 156, 159–160, 86 L.Ed. 89 (1941) (barge owner was not considered as common carrier in transporting cargo within the harbor of New York); *Chicago, R.I. & P. Ry. Co. v. Maucher,* 248 U.S. 359, 362–63, 39 S.Ct. 108, 108, 63 L.Ed. 294 (1919) (here the implication is that railroad hauling circus equipment under special contract is not common carrier, at least with regard to liability for property damage).

There are other special engagement cases which support the position which we have

taken. *Santa Fe, P & P Ry. Co. v. Grant Bros. Constr. Co.,* 228 U.S. 177, 185, 33 S.Ct. 474, 477, 57 L.Ed. 787 (1913); *Baltimore and O.S. Ry. Co. v. Voigt,* 176 U.S. 498, 513–20, 20 S.Ct. 385, 890–93, 44 L.Ed. 560 (1900); *Sasinowski v. Boston & M.R.R.,* 74 F.2d 628, 631 (1st Cir. 1935). The latter case held that the railroad did not act as a common carrier in transporting circus equipment; the court said, "a common carrier is not under any obligation to haul special trains made up by the owners of the cars, in accordance with a schedule made out by the other party, or otherwise than according to its own routine and in its ordinary course of business."

*The Pawnee,* 205 F. 333, 334–35 (E.D. Mich. 1913), resolved that a vessel that carried only under special arrangements for specific cargoes, made no profession to carry for all, was under no obligation to take whatever goods might be tendered, and ran on no particular schedule of time nor between particular places or termini, was not a common carrier.

*See also Bernardi Greater Shows, Inc. v. Boston & M.R.R.,* 89 N.H. 490, 1 A.2d 360, 362–63 (1938) (rev'g. 86 N.H. 146, 165 A. 124 (1933)). This was another circus case which held that the railroad, in handling a circus train, did not act as a common carrier. There are cases such as *Norfolk & W. Ry. Co. v. Dixie Tobacco Co.,* 228 U.S. 593, 595–96, 33 S.Ct. 609, 609–10, 57 L.Ed. 980 (1913) which held liability to exist under the Carmack Amendment, but the carriers in those cases clearly acted as common carriers in most respects or are otherwise distinguishable. Other such cases in which the facts fairly establish that the carrier was acting as a common carrier are *L.E. Whitlock Truck Service, Inc. v. Regal Drilling Co.,* 333 F.2d 488, 490; *Chicago & N.W. Ry. Co. v. Davenport,* 205 F.2d 589, 595 (5th Cir. 1953); *Professional Drivers Services, Inc. v. ICC,* 376 F.Supp. 536, 539 (D. Tenn. 1974). In each of these cases there are factual differences from the case at bar that justify the companies in question being found common carriers.

Other support for our conclusion is found in the law. The note in 76 Yale Law Journal entitled "Borrowed Servants and The Theory of Enterprise Liability, 76 Yale L.J. 807, 817–21 (1967) considered a case in which the damage or injury resulted from an ambiguous arrangement involving lease of equipment and operator. It is said in the note that liability should be imposed on a party who is best able to accurately calculate and efficiently minimize risk; ordinarily that party is lessor, but lessee should be liable instead if he uses equipment for unusual tasks or for tasks with which he is more familiar than is the lessor.

In summary, there is no reason whatsoever for drawing the conclusion from these facts that this was some kind of a put-up contract in order to obtain a desired result. In the first place Weicker is not shown to have been primarily a common carrier. It is more likely that Weicker is a job carrier or a contract carrier. And so it would be very difficult to reach a rational conclusion that Weicker was carrying out the duties of a common carrier.

The most persuasive fact is that this was not the first job that Weicker performed for the appellant Ensco. There were two other similar jobs and they were carried out in the same tailor-made way, not the least important factor being that Ensco was in primary charge of the job once the initial transportation was completed.

■ Once it is concluded, as we have concluded, that Weicker is not liable as a common carrier either in fact or law, it follows that Weicker is not liable at all. The reason for this is the court's ruling out fault or negligence. Negligence is essential to liability under any other possible theory. *Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 110, 62 S.Ct. 156, 160, 86 L.Ed. 89 (1941); *Pilgrim Distrib. Corp. v. Terminal Transp. Co.,* 383 F.Supp. 204, 208 (S.D. Ohio 1974).

### IV. SHIPPING CHARGES

■ The remaining issue is whether the award of $4,245.86 to Weicker on its counterclaim for shipping charges was valid.

Ensco says that it was invalid, and urges that Weicker's failure to deliver the TSD in good condition amounted to a breach of a condition precedent to any obligation to pay shipping charges. It is true that shippers are permitted to recover shipping fees that are already paid on occasion. *Pennsylvania R.R. Co. v. Olivit Bros.*, 243 U.S. 574, 585–86, 37 S.Ct. 468, 472, 61 L.Ed. 908 (1917); *Albion Elevator v. Chicago & N.W. Transp. Co.*, 254 N.W.2d 6, 17–18 (Iowa), *cert. denied*, 434 U.S. 904, 98 S.Ct. 301, 54 L.Ed.2d 190 (1977). Similarly, shippers who have not paid such fees could have been found not liable for them under some circumstances. *See Wilensky v. Central of Georgia Ry. Co.*, 136 Ga. 889, 72 S.E. 418–21 (1911). But instances in which the shippers have been allowed to recover or retain shipping fees usually involve goods lost or damaged by a common carrier, as opposed to a contract carrier or a lessor of equipment and operators. See *Olivit Bros., supra; Albion Elevator, supra.* Here, Weicker was not acting as a common carrier, as seen above.

Moreover, even where the defendant acts as a common carrier, shipping charges are often not recoverable, depending on the facts of the case. In *Olivit Bros., supra,* the Supreme Court noted that non-recovery is the rule "when loss or damage results from no fault or negligence of the carrier." 243 U.S. at 586, 37 S.Ct. at 472. *L.E. Whitlock Truck Service, Inc. v. Regal Drilling Co.*, 333 F.2d 488, 490 (10th Cir. 1964), held that shipping fees should be awarded to common carrier despite award of damages to shipper where damage to the cargo was not caused by any negligence on part of carrier. And in *Albion Elevator, supra,* the court recognized that the ordinary damage rule allows no recovery of freight expenses by the shipper, although it allowed recovery under a special rule applying to cases involving contractual provisions for measuring loss at the point of shipment. 254 N.W.2d at 17. In the instant case there is no evidence of fault or negligence on the part of Weicker, and there is no other factual support for applying any rule other than the usual one.

Assuming that Weicker functioned as a mere lessor, as the trial court found, it would clearly be entitled to shipping charges (or "rental fees")—assuming that Jaycox did not act negligently or that he acted as the borrowed servant of Ensco. Even if Weicker was functioning as a contract carrier, Ensco would not be entitled to refuse to pay shipping charges, for the reasons suggested above. Contract carriers are ordinarily not subject to the liability for shipping fees that common carriers occasionally face. In any event, the trial court found that Weicker was not negligent, and we agree with that determination. Accordingly, the trial court properly awarded the shipping charges to Weicker.

The judgment of the trial court is, in general, affirmed; however, inasmuch as the $29,337.38 was the amount of the judgment, all except $4,245.86 for shipping charges must be set aside by the trial court in view of the confession of error. The judgment is affirmed in all other respects. The amount of the judgment in favor of Weicker is reduced from $29,337.38 to $4,245.86 plus interest and costs.